(C. D. 866)

BURGESS BATTERY CO. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided July 6, 1944)

*Sidley, McPherson, Austin & Burgess (Walter V. Schaefer* of counsel) for the plaintiff.

*Paul P. Rao,* Assistant Attorney General (*Dorothy C. Bennett,* special attorney), for the defendant.

Before CLINE, KEEFE, and EKWALL, Judges

KEEFE, Judge: The merchandise involved here consists of scrap zinc imported from Canada and was classified as "old and worn-out zinc, fit only to be remanufactured" under paragraph 394 of the Tariff Act of 1930 at 1½ cents per pound. The importer claims that the merchandise is entitled to free entry as American goods returned under the provisions of paragraph 1615, as amended. An agreed statement of fact was entered into as to the merchandise covered by each of the protests and each of the entries therein. In order to not unduly extend the opinion we quote the stipulation below as filed with protest 44111K insofar as it applies to entry AO–1950, omitting the part

covering the goods under entry AO–2546, as the language in that part of the stipulation is identical except for the quantities and shipping data. The stipulation filled with protest 44112K is also fully covered:

It is hereby stipulated and agreed by and between counsel for the plaintiff and the Assistant Attorney General, attorney for the United States, subject to the approval of the court, that the following facts concerning the merchandise, zinc line scrap covered by the protest enumerated above and represented by the item marked A on the invoices and checked by Archie McKenzie, assessed with duty at the rate of 1½ cents per pound under paragraph 394 of the Tariff Act of 1930 as old zinc fit only to be remanufactured, are true and may be so considered by the court as offered and received in evidence without further proof as to competency:

1. Burgess Battery Co. is a Delaware corporation which, on December 1, 1939, pursuant to a Plan of Reorganization acquired the business and assets of Burgess Battery Co., a Wisconsin corporation. Burgess Battery Co., a Wisconsin corporation, was dissolved on December 28, 1939. The two companies are referred to collectively herein as the "plaintiff."

2. The plaintiff is engaged in the business of manufacturing flashlight, radio, and ignition batteries. It operates manufacturing plants at Niagara Falls, Ontario, Canada, and Freeport, Ill.

3. From time to time the plaintiff has purchased zinc in strip form from the New Jersey Zinc Co., located at Aquashicola, Pa. The zinc strips have been shipped by rail to the company's plant at Niagara Falls, Ontario, Canada, and there from the zinc strips battery cases have been punched by punch presses. The processes involved in the production of such cases are the following:

(a) A zinc strip of proper gauge and width is fed into a cupping press, which punches from this strip circular discs known as "blanks." The residue of the zinc strip after this punching process is perforated with large holes. This residue is commonly known in the industry as "cupper scrap." A diagram showing cupper scrap is contained at the top of the blue print attached hereto as exhibit A, and an actual sample of cupper scrap is attached hereto as exhibit B.

(b) The circular blanks punched out of the zinc strip are then formed into cups and these cups are fed into drawing presses, each of which presses reduces the diameter of the cup and increases its height. As the height increases through each successive redrawing, the top edge becomes more irregular. At the fourth redraw, which is called the "intermediate squeeze-off," the irregular top edge is trimmed by being "squeezed off" so that it will not interfere with subsequent redraws. This irregular top edge of the cup so "squeezed off" is known as "line scrap."

(c) When the fifth and sixth redraws are made, the can top again becomes irregular, so that it is necessary on the sixth redraw to trim the top edge to secure a finished can with an even, clean top edge. The irregular top edge trimmed off at this "final squeeze-off" is also known as "line scrap." The complete drawing process showing a cup first produced from the discs cut out of the zinc strip and each successive redraw of the cup is shown at the bottom of the blue print attached hereto as exhibit A, and samples of line scrap produced at the "intermediate squeeze-off" and at the final "squeeze-off" are attached hereto as exhibits C and D, respectively.

### ENTRY AO–1950

4. On September 28, 1939, October 9, 1939, and October 13, 1939, the plaintiff exported certain zinc strips from Aquashicola, Pa., where said zinc strips were manufactured, consigned to itself at Niagara Falls, Ontario, Canada. Said zinc strips were shipped in cars Nos. CCC&STL 48983, PRR 51210, and ACL 46554.

5. From said zinc strips the plaintiff manufactured in its Canadian factory cans for use as casings for dry cell batteries by subjecting the strips to the processes hereinbefore described. The zinc scrap remaining after these operations consisted of 25,179 pounds of cupper scrap, 10,106 pounds of line scrap, and 715 pounds of defective cans (which were faulty or damaged in some manner while moving down the line of presses); all of which was returned to the United States and is covered by the instant Entry No. AO–1950, filed December 2, 1939, with the United States Customs Service.

6. This scrap was imported by the plaintiff into the United States in car No. CN 464647 on December 2, 1939. This shipment was entered by the plaintiff through its agent and broker, F. W. Myers & Co., Inc., at Port Huron, Mich. and was consigned to the plaintiff's plant at Freeport, Ill., where it was rerolled into new zinc strips which could be again subjected to the processes above described which are involved in manufacturing battery cases.

7. At the time of, and in connection with, this entry, the company caused to be filed with the United States Customs Service the following documents:

(a) A declaration of the foreign shipper certified by the American Consular officer on consular Form 129.
(b) An affidavit of the agent or owner on customs Form 3311.
(c) A certificate of exportation of the collector of customs at Niagara Falls, N. Y., on customs Form 4467.

8. This shipment was entered under paragraph No. 1615 of the Tariff Act of 1930, as amended by section 35 of the Customs Administrative Act of 1938, as articles manufactured in the United States "when returned after having been exported, without having been advanced in value or improved in condition by any process of manufacture or other means." The acting appraiser at the port of entry advisorily classified the 25,179 pounds of cupper scrap as free of duty under said paragraph 1615, and the balance (consisting of 10,106 pounds of line scrap and 715 pounds of defective cans) as dutiable at 1½ cents per pound under paragraph 394. The entry was liquidated accordingly on July 8, 1940, and the plaintiff paid, under protest, duties amounting to $162.31.

\*     \*     \*     \*     \*     \*     \*

13. No drawback, bounty, or allowance has been paid or admitted on any of the shipments referred to in this stipulation.

14. This protest is limited to the line scrap indicated in green ink on the invoices by the examiner by means of the symbol A and his initials, consisting of 10,106 pounds on Entry AO–1950 and 10,082 pounds on Entry AO–2546, and is abandoned as to all other merchandise covered by these entries. Further amendment to the protest is waived, and the protest is deemed submitted on this stipuation and such additional evidence as was offered at the trial.

The stipulation filed with protest 44112–K also limits the same to the line scrap indicated in green ink on the invoices by the examiner by means of the symbol A and his initials, and abandoning all other merchandise.

The paragraphs of the Tariff Act of 1930 at issue here provide in part as follows:

PAR. 394. Zinc \* \* \* in sheets, 2 cents per pound; \*.\* \* old and wornout zinc, fit only to be remanufactured, zinc dross, and zinc skimmings, 1½ cents per pound.

### TITLE II—FREE LIST

PAR. 1615 (as amended by section 35, Customs Administrative Act of 1938) (a) Articles, the growth, produce, or manufacture of the United States, when returned

after having been exported, without having been advanced in value or improved in condition by any process of manufacture or other means.

\*      \*      \*      \*      \*      \*      \*

(h) The allowance of total or partial exemption from duty under any provision of this paragraph shall be subject to such regulations as to proof of identity and compliance with the conditions of this paragraph as the Secretary of the Treasury may prescribe.

At the trial plaintiff's witness testified that the merchandise in question when returned to the plant in this country is melted and re-rolled into a finished strip zinc.

The plaintiff contends that the article exported from the United States was zinc and the article returned to the United States was zinc and inasmuch as it was neither advanced in value nor improved in condition it is properly entitled to free entry as American goods returned. In a well-written brief plaintiff relies upon the cases of *United States* v. *Rubelli's Sons et al.*, 8 Ct. Cust. Appls. 399, T. D. 37645; *United States* v. *Saunders*, 8 Ct. Cust. Appls. 82, T. D. 37200; *United States* v. *Tower & Sons*, 9 Ct. Cust. Appls. 135, T. D. 37981; and *in re John J. Beck*, T. D. 26865, admirably distinguishing the cases of *United States* v. *Brunswick Radio Corp.*, 22 C. C. P. A. 346, T. D. 47374, and *Shell Oil Co. of Canada, Ltd.* v. *United States*, 27 C. C. P. A. 94, C. A. D. 68.

The Government argues that the zinc in question does not fall within the provisions of paragraph 1615 because it is not the same articles previously exported from the United States, for the reason that the articles exported consisted of zinc sheets, whereas the imported articles consist of zinc rings definitely known in the trade as "line scrap." The Government in its brief expresses its views as follows:

Paragraph 1615 (a) of the Tariff Act of 1930, as amended by section 35, Customs Administrative Act of 1938, quoted *supra*, does not provide for free entry of all American goods returned to the United States, but extends this privilege only to instances where the "article" exported from this country is "returned" without having been advanced in value or improved in condition. It is clear from the language of the statute that if a commodity *other than* the "article" previously exported is returned to the United States, the privilege of free entry does not apply, irrespective of whether the returned commodity is of greater or less value than the American article previously exported. The statute has been so construed in the cases of *United States* v. *Brunswick Radio Corp.*, 22 C. C. P. A. (Customs) 346, T. D. 47374, and *Shell Oil Co.* v. *United States*, 27 C. C. P. A. (Customs) 94, C. A. D. 68.

\*      \*      \*      \*      \*      \*      \*

\* \* \*. Therefore, the Government contends that since American zinc sheets were exported to Canada, and articles of zinc scrap in the form of irregular zinc rings were returned in the instant importations, the articles exported were not, in the tariff sense, the same as those returned to the United States.

\*      \*      \*      \*      \*      \*      \*

[Defendant's brief pages 5–7.]

In advancing the foregoing theory the Government fully relies upon the *Brunswick* and *Shell* cases, *supra*, and also upon the case of *South Porto Rico Sugar Co.* v. *United States*, 2 Cust. Ct. 263, C. D. 138, where this court held that a mill roll manufactured in the United States and exported was not free as American goods returned because it had been broken into pieces and thereby lost its identity.

We find that our appellate court has consistently held that such portion of American goods as has undergone processing abroad may be returned to the United States under the duty-free American goods returned provision when produced by a "process of segregation or elimination." Inasmuch as it is stressed that the courts have departed from earlier positions taken in regard to classification of merchandise as American goods returned, we deem it pertinent to set out the following decisions holding that scrap materials, the residue from the manufacture of American products previously shipped abroad, are entitled to free entry as American goods returned.

*In re Cullen*, T. D. 24012, G. A. 5209, certain films had been previously shipped to Canada, there exposed, and returned to the United States. The collector assessed duty thereon as celluloid manufactures. The importer claimed that the films were not advanced in value or improved in condition by any process of manufacture or other means, and therefore were free of duty as American goods returned.

The court in announcing the principle that in order to remove the films from the free paragraph it must appear, first, that they had been advanced in value while abroad, or second, that they have been improved in condition while abroad by some process of manufacture or other means. In applying it to the condition there present, the court found that the certificate of exportation showed a value upon exportation of $6, and noted that the same value used upon the return of the merchandise was passed as correct by the appraiser, and from such evidence the court concluded that the goods had not been advanced in value since their exportation. The court there stated:

We are of the opinion that the words "improved in condition" as used in paragraph 483 [Act of 1897], must be taken in a commercial sense, and while it is admitted that the articles, or at least some of them, had been changed in condition at the time of importation from their condition at the time of exportation, they can not be said to have been improved in condition commercially. They were still photographic films, and as such, from a dealer's standpoint, they had not been improved in condition, but, on the contrary, had been rendered absolutely worthless. * * * the words of the paragraph in question are "improved in condition," and not "changed in condition," which latter words were used in the act of 1883, so that even if the word "improved" be taken in any sense, whether commercial or sentimental, it is absolutely impracticable for examining officers to determine whether a photographic film, at the time imported, has been even changed in condition, much less whether it has been improved.

We accordingly hold that photographic films not further changed in condition than by being exposed in a camera have not been advanced in value or improved

in condition within the meaning of those words as used in paragraph 483. and that such articles when of "American manufacture" are entitled to free entry under that paragraph.

*In re Beck* (G. A. 6212, T. D. 26865, 10 Treas. Dec. 588) involved scrap steel returned to the United States from Canada. It had been exported to Canada in the form of hoop or band steel and used exclusively in the manufacture of fence locks. In cutting or stamping operations a considerable amount of scrap resulted. This scrap constituted the merchandise returned to the United States. The court found that the scrap steel clearly had not been advanced in value or improved in condition and that the process of manufacture had actually depreciated the value thereof. It was held entitled to free entry as American goods returned.

In *Saunders* v. *United States*, Abstract 40192, 31 Treas. Dec. 247, the importation consisted of tin disks. There certain tin plate was exported to Canada and used in the manufacture of cans for vegetables, etc. In manufacturing the cans flat pieces of tin were cut out of the tops of the cans "the hole thereby left constitutes the opening through which the cans are filled, and emptied when their contents were used." The importers contended that the tin disks were the same tin as exported. The evidence established that the tin disks when returned were used largely as tops and bottoms of tobacco boxes. There also the Government contended that the disks were not the same as the exported merchandise because it then consisted of tin plate in sheets while the importation consisted of small circular pieces of tin. This court held the tin disks properly entitled to free entry as American goods returned. The Government appealed to the Court of Customs Appeals. See *United States* v. *Saunders et al.*, 8 Ct. Cust. Appls. 82, T. D. 37200. There the appellate court found "that all three of the protests should be considered as presenting the meritorious question involved, which is whether these small pieces of tin plate exported from the United States and returned to the United States in the form of small disks 2 inches in diameter, the disks having been produced as a byproduct of the manufacture in Canada, are to be admitted under the applicable paragraph as American goods returned, not advanced in value or improved in condition. In holding that the disks were free of duty as American goods returned the court, citing *in re Beck, supra*, stated as follows:

it may be said of the material here in question, as was said in that case, that the tin disks under consideration have not been advanced in value or improved in condition, but rather depreciated by the process of manufacture. We think that any other view that might be taken of this subject is precluded by the legislative adoption of the rule which was laid down in the case cited as early as 1905, and it has not since been departed from.

In *United States* v. *Rubelli's Sons et al.*, 8 Ct. Cust. Appls. 399, T. D. 37645, certain zinc dross or hard spelter was classified as un-

wrought metal. It was claimed free as American goods which had been exported to Canada and returned without having been advanced in value or improved in condition. The Government claimed it was not free because it was not the merchandise exported, the exported material being soft spelter and the returned material being hard spelter. It developed at the trial that the soft spelter was used to galvanize iron pipes, being first melted, and the iron pipes after being treated with certain acids were immersed therein. The immersion of the cold iron pipes in the molten zinc produced some crystallization of the melted metal, the crystallized particles falling to the bottom of the tank. This crystallized material was hard spelter, which from time to time was drawn off into molds and redistilled to clear it of its impurities. Such hard spelter contained from 92 to 94 per centum of zinc, and soft spelter contained from 94 to 98½ per centum. Soft spelter, redistilled from hard spelter, contains from 99.5 to 99.7 per centum of zinc. For the purpose of galvanizing only soft spelter produced from zinc ore is used. The redistilled soft spelter is too costly for any such purpose and is used to make alloys. Hard spelter has no use except that of remanufacture by distillation and is worth only 82 per centum of the price of soft spelter derived from zinc ore. In holding that the hard spelter was free as American goods returned the court stated:

On this state of facts it is very evident that what was exported from the United States was zinc, and that what came back was zinc, which, far from being improved in value and condition, was rendered useless except for remanufacture, and was not only of less value, but was really in a worse condition than when it passed from the United States into Canada. We must therefore hold that the article exported from the United States and subsequently returned thereto was zinc, neither advanced in value nor improved in condition.

In *United States* v. *Tower & Sons*, 9 Ct. Cust. Appls. 135, T. D. 37981, certain merchandise was imported as scrap tungsten. It was classified as tungsten under paragraph 102 of the act of 1913. The importers claimed that it was free of duty as American goods returned. The merchandise which was exported consisted of tungstic acid, an impalpable yellow powder. It was exported for use in the manufacture of tungsten wire for incandescent lamp fillings. For such purpose the tungstic acid was dissolved in ammonia and the insoluble materials filtered out, consisting of small lumps of claylike material said to contain tungsten, lime, and other impurities. This was one of the substances imported. The next process produced metallic tungsten which was cast in small ingots, the clipped ends of which, consisting of small metallic cubes, were another of the substances imported. The tungsten ingots were made into wire of different sizes. Scraps of such wire constituted the third class of merchandise there imported. The lower court sustained the protest as to all three classes of material. The appellate court, however, in construing the American goods returned provision relative to the phrase "when returned after having

been éxported, without having been advanced in value or improved in condition by any process of manufacture or other means" stated:

* * *. This legislative change unquestionably contemplated such articles might thereafter be imported though *changed in condition*, provided, however, they were not *advanced* in value or *improved* in condition.

There is no dispute in the record, we think, that no one of these classes of importations as imported was advanced in value or improved in condition. These facts are not disputed. Nor is it disputed that all the importations were returned solely to reclaim the tungstic acid in them, and in the condition imported were fit for no other use. It is disputed, however, by the Government that they are in the changed conditions as imported "*articles* the growth, produce, or *manufacture* of the United States."

We think that the first class of importations, referred to as the "insoluble residue" * * * is ruled by *United States* v. *Rubelli's Sons et al.* (8 Ct. Cust. Appls. 399, T. D. 37645). That case concerned hard spelter imported into the United States after being produced from soft spelter exported therefrom to Canada. * * *.

The process of production therefore of hard from soft spelter was but a process of segregation or elimination. So here the process of producing this "insoluble residue" is but a process of segregation or elimination, and the cases do not seem to be distinguishable. The processes applied are not manufacturing processes. No new article of manufacture is produced. * * *.

The other two classes of importations here made, however, seem to the court to be distinguishable. The tungstic acid in the condition of a powder has undergone such processes of manufacture as to produce an entirely different article—a metal. Indeed, the third class of these importations has undergone further processes of manufacture producing from the metal ingots—wire. While the intent of Congress to permit free entry of such articles *changed in condition* must be observed, there is no warrant in going so far in that observance as to defeat the limitations afforded by the language of the provision granting this right of free importation. If the returned articles are manufactured articles the paragraph provides they must be "manufactures of the United States" returned after having been exported. These two last classes of merchandise are manufactures, or residues thereof, not of the United States but of Canada, the manufacturing processes, the result of which gives them their names, characters, and uses, whatever they may be, having been applied in Canada. As returned, they are not the same article changed in condition, but different articles produced by different manufacturing processes applied not in the United States but in Canada. The court therefore is of the opinion that they are not entitled to free entry under this paragraph.

In *Norton Co.* v. *United States*, Abstract 47334 (old series), finished alundum was exported to Canada where it was combined with clay and feldspar similar to cement and then mixed with water and molded into the shape of wheels. The wheels, when baked and hardened, were ground into shape. The broken or defective wheels, and the truing or bushings, thrown off in the grinding process, constituted the imported merchandise claimed to be American goods returned. The court held that the identity of the alundum as originally exported was lost when that commodity was manufactured into wheels. It was also held that when the wheels were ground down the fragments, shavings, and bushings therefrom could not be identified as alundum.

The case of *South Porto Rico Sugar Co.* v. *United States*, Abstract

36337, involved certain mill roll shells in a worn-out condition imported from the Dominican Republic into Puerto Rico. The importer claimed that they, were free of duty as American goods returned. It there appeared that these same mill roll shells in a rough condition were exported to the Dominican Republic where they were smoothed and machined to fit the particular factory requirement of certain sugar machinery. They were there used until worn out and then returned to Puerto Rico. When imported they were not suitable for use in milling cane sugar, nor for any other use except foundry scrap. In holding that the scrap rolls were entitled to free entry as American goods returned this court stated:

> Our inquiry in the controversy before us is whether or not the value of the merchandise at the time of importation was greater or the condition thereof better than when exported from Puerto Rico. See *United States* v. *Bird*, 11 Ct. Cust. Appls. 229, T. D. 38991. Merchandise is dutiable according to its condition at the time of importation. Therefore an enhancement *in value or improvement in condition of an article in a foreign country becomes immaterial when it is shown that, through use of the article in the foreign country, such enhancement in value or improvement in condition has been removed or destroyed before being returned.* We have evidence before us to show that the articles shipped from Puerto Rico were valuable pieces of machinery manufactured for a particular purpose, although in rough form, and that the articles when returned to Puerto Rico were unsuited for the purpose for which they were designed and were in such a deteriorated condition that they were suitable only for remanufacture, and were invoiced at only a fraction of their value when originally exported. *We believe that the evidence is sufficient to show that the condition of the mill roll shells, when returned to Puerto Rico was not improved when compared with the same articles at the time of exportation, and that the value at the time of importation was not advanced over the value of the articles at the time of exportation.* [Italics not quoted.]

Relying upon the authority of the *Rubelli* case, *supra*, the court found that the merchandise imported was the identical merchandise exported; that the condition of the returned articles was not better than when exported, nor of greater value, and therefore held the merchandise entitled to free entry as American goods returned.

Several years later the same importer again imported similar mill rolls from the Dominican Republic. (See *South Porto Rico Sugar Co.* v. *United States*, 2 Cust. Ct. 263, C. D. 138.) There a rough mill roll shell was finished to fit particular sugar machinery upon arrival in the Dominican Republic from Puerto Rico. After having been worn out this shell was broken into several pieces and shipped back to Puerto Rico as foundry scrap. The importer claimed free entry for the same as American goods returned. At the trial of that case the Government was successful in preventing the plaintiff's witness from testifying to any of the pertinent facts essential to a determination of the issue. All that appears is that the only difference between the imported material and that the subject of decision in Abstract 36337 was that the roll in question in the latter case was broken in 12 pieces, whereas in the former case the rolls were not broken.

In deciding the case the court noted that the appraiser, in his answer to the protest, concluded that the roll was advanced in value and improved in condition in a foreign country because it had been finished for use in milling sugarcane after arriving in the Dominican Republic, and, after citing paragraph 1615, stated:

It will be observed that the *articles* accorded free entry under said paragraph *must not be improved in condition after exportation.* It is uncontradicted that the roll originally exported was in a rough and unfinished condition; that it was processed and finished abroad; that, after it was worn out and not fit for use as a roll, the purpose for which it was originally constructed and designed, it was broken up and reduced to scrap form, in which condition it was imported into the United States. It therefore follows that it was not a roll which was imported but so much scrap, and that said scrap is *eo nomine* provided for in said paragraph 301 at 75 cents per ton.

*When the roll was reduced to scrap it lost its identity as a roll.* * * *. [Italics not quoted.]

In connection with the foregoing decision, it might be well to note that in *United States* v. *Bird,* 11 Ct. Cust. Appls. 229, T. D. 38991, our appellate court, in respect to the provision in the American goods returned paragraph, as to the phrase "when returned after having been exported, without having been advanced in value or improved in condition by any process of manufacture or other means" stated as follows:

* * * it is incumbent upon the importer to establish that these machine parts *when returned* had not been advanced in value or improved in condition, or, what would be the equivalent, *that the value was no greater and the condition no, better than when exported from the United States.* [Italics not quoted.]

In view of the foregoing interpretation by our appellate court of the language contained in the American goods returned paragraph, a contrary interpretation by this court is valueless as a precedent. Likewise the above-quoted statement that the mill roll lost its identity as a roll when reduced to scrap, advanced by the court as a reason for denial of free entry as American goods returned, is contrary to the ruling of our appellate court in the *Tower* case, *supra,* where appears the following:

This legislative change unquestionably contemplated such articles might thereafter be imported though *changed in condition,* provided, however, they were not *advanced* in value or *improved* in condition.

Clearly, the latter *South Porto Rico Sugar Co.* case, *supra,* should have been overruled for lack of evidence, but for none of the reasons set out by the trial court.

As stated above the *Porto Rico Sugar Co.* case is valueless as a precedent. Likewise the *Brunswick Radio Corp.* case, *supra,* and the *Shell Oil Co.* case, *supra,* dealt with a different situation than is here before us in this case. In each of those cases our appellate court distinguished, rather than reversed, former decisions.

*United States* v. *Brunswick Radio Corp.*, *supra*, involved broken phonograph records, imported from Canada, claimed to be American goods returned. There certain "talking machine recording compounds" in the form of square sheets about the diameter of phonograph records were shipped to Canada and manufactured into records by putting a master record of metal together with a sheet of the recording compound in a steam press and applying pressure and heat so as to melt the compound to such an extent that with the pressure an impression of the master record will be made upon the compound. The product was then trimmed to a circular shape and polished by means of a buffer. The material in the recording compound was not changed in any manner by the application of manufacturing processes in producing the phonographic record. After the exported material was manufactured into phonograph records it was discovered that a large quantity was defective. These defective records were broken up into small pieces, imported into the United States, placed in mixing vats, and remanufactured into sheets of recording compound, such broken records being valued at about 50 per centum of the exported recording compound.

Our appellate court there stated that the real issue in the case is as follows:

* * * whether the imported merchandise is the merchandise exported from the United States, changed in condition only without having been advanced in value or improved in condition by any process of manufacture or other means, or is it, on the contrary, waste, produced by the breaking of articles which were manufactured in Canada from the exported material. If it is the former, it is entitled to free entry, as held by the trial court. If it is the latter, it is not exported articles returned to the United States, but Canadian goods imported into the United States, and, therefore, dutiable as assessed by the collector.

The court concluded that the exported merchandise had not been merely changed in condition, but a wholly different article had been manufactured in Canada. The court quoted with approval from the *Tower* case, *supra*, and held that the broken phonograph records were not produced by a "process of segregation or elimination," as was the "insoluble residue" held to be American goods returned in the *Tower* case, but consisted of a wholly different article, the product of Canada, and therefore dutiable as waste. The plaintiff aptly points out in its brief that the broken phonograph records involved in the *Brunswick* case stand in exactly the same position as do the defective battery cans returned to the United States by the plaintiff, and that the cupper scrap and the line scrap, the latter being assessed with duty, segregated from the battery cans during the manufacturing process, may be compared with the insoluble residue in the *Tower* case, which resulted only from a process of segregation and elimination, no new article being produced.

The case of *Shell Oil Co. of Canada, Ltd.* v. *United States*, 27 C. C. P. A. 94, C. A. D. 68, is clearly distinguishable from the cases cited heretofore, and is no authority for the Government's statement that "the Court of Customs and Patent Appeals appears to have departed somewhat from the rules applied in earlier cases." In the *Shell* case a Canadian company purchased large quantities of crude petroleum in the condition as it came from wells located in Texas and Louisiana, and exported it to Montreal where it was subjected to a "cracking" process by means of which gasoline was extracted. The residue, described as liquid petroleum residue from crude petroleum, was returned to the United States and entered as American goods returned, and classified free of duty as petroleum under paragraph 1733. However, the collector assessed a tax, the equivalent of a customs duty, at the rate of ½ cent per gallon pursuant to the provisions of section 601 (c) (4) of the Revenue Act of 1932.

As to the Government's contention there that the segregation of the gasoline was a process of manufacture, the court stated:

\* \* \*. It is noted that the statute reads "without having been advanced in value or improved in condition by any process of manufacture *or other means.*" [Italics the court's.] So, it is unnecessary to dilate upon the refinements of meaning of the term "manufacture." However, it seems quite clear to us that the process by which the separation of materials was brought about was a process of manufacture, and the so-called residue in its condition as imported is a result of that process.

The appellate court there held that the first question to be determined was whether the imported merchandise was the merchandise that was exported. If determined to be the same then any advancement in value and improvement in condition becomes of importance, but if found not to be the same, value and condition is of little consequence.

On reaching the conclusion that the merchandise was not American goods returned the court stated as follows:

Appellant carried a product of nature—crude petroleum—into Canada and there by a process of manufacture separated certain elements of that product from other elements. Appellant's primary object doubtless was to obtain the element known as gasoline, but in the very process of obtaining this element there was also obtained the merchandise involved. That the gasoline *per se* was a resultant of the process and that it was something distinct from the material exported seems clear, and to us it seems equally clear that the residue occupies the same status. The mere fact that it was not the primary article which appellant desired and that, in a sense, it was "unwanted" does not affect its *per se* status as an article resulting from a process of manufacture in Canada, nor does the fact that its production was an unavoidable result of the process used in obtaining the particular article primarily desired affect that status.

Also, in distinguishing the *Rubelli* and *Tower* cases, *supra*, the court stated:

An essential difference, it seems to us, lies in the fact that the hard spelter involved in the *Rubelli's Sons et al.* case, *supra*, and the "insoluble residue" of

tungstic acid of the *Tower & Sons* case, *supra*, did not result from the processing of materials from which they were derived for the purpose of changing the character or form of any element of the basic material, or for separating one element from another. The soft spelter exported was not processed to separate it into parts, as was the crude petroleum here, nor was the tungstic acid. The basic materials involved in those cases were applied immediately and directly to the manufacture of certain merchandise entirely different in character, and the respective residues of zinc and tungstic acid were not new articles.

In the instant case the crude petroleum was not applied to the making or finishing of extraneous manufactures but was itself and by itself processed in a manner which resulted in new and distinctive articles—one being gasoline; the other being oil.

In the classification of the material here before us, applying the principle announced in the foregoing decisions, the first question presented is whether or not the article exported was returned. Unquestionably the merchandise exported was zinc; it is immaterial whether it was in sheets, blocks, or other form. The merchandise which was returned is certainly nothing more than zinc. Any processes applied to the exported article so far as they affected the imported article were processes of segregation or elimination and not processes of manufacture or other means used to increase the value or improve the condition thereof. The evidence shows that the value was decreased and the condition so deteriorated that the article was rendered useless except for remanufacture. The imported "line scrap" zinc is admittedly changed in condition, but, because of manufacturing processes applied to the exported zinc, it has not become a manufacture of Canada with a new name, character, and use. Our appellate court held in the *Tower* case, *supra*, that it was the intent of Congress to permit free entry of American goods returned when changed in condition provided such goods had not, because of manufacturing processes in another country, obtained new names, characters, and uses, and thereby ceased to be the same articles as exported from the United States.

The Government in an attempt to establish a lack of identity between the exported and imported article contends that Congress has recognized "zinc * * * in sheets" and "old and worn-out zinc" as separate and distinct articles of commerce by separately providing therefor in the tariff act; that is to say, the article exported and the article returned, having an entirely different tariff status, the one being zinc sheets and the other zinc scrap, the article exported is not, in the tariff sense, the same as the article returned to the United States. *In re Beck*, *supra*, involved merchandise which upon exportation from the United States was "hoop or band steel" *eo nomine* provided for in paragraph 128 of the Tariff Act of 1897. When returned to the United States, the collector classified it as "scrap steel" also *eo nomine* provided for under paragraph 122 of said act. In the *Saunders* case, *supra*, the merchandise exported was "tin plates"

*eo nomine* provided for under paragraph 130 of the Tariff Act of 1909. When returned to the United States the collector classified the same under paragraph 199 of said act, a catch-all provision for articles of iron or other metal. The same question was before the court in the *Saunders* case, the Government there contending that tin plate in sheets was exported, and the tin in disks imported was scrap tin, an entirely different tariff status. The trial court, however, overruled such contention, on authority of the *Beck* case, and noted that:

* * *. These decisions were before Congress when this paragraph of the law was reenacted in 1913, and it is therefore presumed that Congress, in reenacting that provision in the law of 1913, did it with clear understanding that it would be so administered.

Before the appellate court, the majority overruled such contention in practically the same language as used by the trial court. Judge Smith, dissenting, was of the opinion that the article leaving the United States was tin plate and what came back was tin disks, a product of tin plate. Since that time several tariff acts have been written by Congress without changing the American goods returned paragraph clarifying the situation. Therefore it must be presumed that Congress has adopted the rule announced in the early cases. Notwithstanding the different tariff status of the goods in each case, the courts held the returned American manufacture entitled to free entry as American goods returned, upon the ground that when returned the goods were still American products and not foreign products. Here also we have the same situation. The zinc scrap in question, irrespective of its shape or form, attained its status as zinc through a manufacturing effort of the United States, and regardless of whatever manufacturing effort was expended thereon in Canada it still remained zinc manufactured in the United States and nothing more.

For the reasons stated, and following the decisions cited, we hold that the merchandise marked A together with the initials of the examiner on the invoices is properly entitled to free entry under paragraph 1615 of the Tariff Act of 1930, as amended. In all other respects the protests having been abandoned are dismissed.

Judgment will be entered accordinglv.