(C. D. 1713)

ARTHUR J. HUMPHREYS *v.* UNITED STATES

United States Customs Court, Third Division

(Decided June 29, 1955)

*Lillick, Geary, Olson, Adams & Charles; Lawrence & Tuttle (George R. Tuttle* and *Charles F. Lawrence* of counsel), associate counsel; for the plaintiff.

*Warren E. Burger,* Assistant Attorney General (*Alfred A. Taylor, Jr.,* trial attorney), for the defendant.

Before EKWALL and JOHNSON, Judges

JOHNSON, Judge: This case involves copra oil-cake meal, imported from Canada on or about September 18, 1953, and assessed with duty at three-tenths of 1 cent per pound under paragraph 730 of the Tariff Act of 1930 as vegetable oil-cake meal, not specially provided for. It is claimed that the merchandise is entitled to free entry under the terms of the Philippine Trade Act of 1946 (60 Stat. 141, 22 U. S. C. 1251), as a Philippine article, on the ground that it was derived from copra originating in the Republic of the Philippines.

When the case was called for trial, counsel for the plaintiff stated the facts as follows:

The facts are these; that copra a product of the Philippines was imported into Canada directly from the Philippine Islands by the shipper of the merchandise the Northern Vegetable Oils Ltd. of Vancouver; this importation was made with the intention of processing copra into copra meal and oil by the use of a press and then ship the meal into the United States. This was done and the copra meal covered in this process was placed in bags for the purpose of shipment; the bags do not represent as much as twenty per cent of the total value of the importation and the cocoanut oil was not exported to the United States.

Counsel for the Government moved to dismiss the protest on the ground that said facts did not constitute a proper cause of action, and, for the purpose of a decision on the motion, agreed to accept said facts.

The pertinent provisions of the Philippine Trade Act of 1946, *supra,* under which the claim is made, are as follows:

SEC. 2. DEFINITIONS.

(a) For the purposes of this Act—

   \*      \*      \*      \*      \*      \*      \*

(4) The term "Philippine article" means an article which is the product of the Philippines, unless, in the case of an article produced with the use of materials imported into the Philippines from any foreign country (except the United States) the aggregate value of such imported materials at the time of importation into the Philippines was more than twenty per centum of the value of the article imported into the United States, the value of such article to be determined in accordance with, and as of the time provided by, the customs laws of the United States in effect at the time of importation of such article. \* \* \* For the purposes of this paragraph any imported material, used in the production of an article in the Philippines, shall be considered as having been used in the production of an article subsequently produced in the Philippines, which is the product of a chain of production in the Philippines in the course of which an article, which is the product of one stage of the chain, is used by its producer or another person, in a subsequent stage of the chain, as a material in the production of another article.

   \*      \*      \*      \*      \*      \*      \*

SEC. 201. FREE ENTRY OF PHILIPPINE ARTICLES.

During the period from the day after the date of the enactment of this Act to July 3, 1954, both dates inclusive, Philippine articles entered, or withdrawn from warehouse, in the United States for consumption shall be admitted into the United States free of ordinary customs duty.

The issue before us is whether the imported merchandise, copra oil-cake meal, processed in Canada from copra from the Philippine Islands, is a "Philippine article," within the meaning of the above definition.

It is clear from the definition that the term "Philippine article" is limited to products of the Philippines, not including those produced with the use of imported materials (except those from the United States), if the aggregate value of such materials is more than 20 per centum of the value of the article imported into the United States. The question is whether the term includes or excludes articles derived from Philippine products by processing in another country.

The statute contains a number of references to articles produced in the Philippines but none to articles produced elsewhere from Philippine materials. The definition, for instance, refers to articles produced *in the Philippines*, with not more than 20 per centum of foreign materials. In the sections on quotas, quotas for unrefined sugars are directed to be allocated to the sugar-producing mills and plantation owners *in the Philippines* and for refined sugars, cordage, and other articles to manufacturers *in the Philippines* (sections 211, 212, and 214).

In Report No. 1821 of the Ways and Means Committee of the House of Representatives in connection with the bill (1946 United

States Code Congressional Service 1146), it is stated (pp. 1147 and 1149):

> Particular attention is called to the definition of "Philippine article" found in section 2 (a) (4) of the bill, which *confines* a "Philippine article" to a product of the Philippines not more than 20 percent of the value of which consists of the value of imported materials used in its production. * * *
>
> \*        \*        \*        \*        \*        \*        \*
>
> **Philippine article (sec. 2 (a) (4)):** The term "Philippine article" is defined to mean a product of the Philippines; that is, an article which originated *in the Philippines* by growth or derivation from nature, as well as an article which has been fabricated or manufactured *in the Philippines* to such an extent that the finished product is identifiable as of Philippine origin even though some imported materials may have been used in the operation. * *· * [Italics supplied.]

It is true that, as plaintiff points out, the Philippine Trade Act does not contain provisions similar to those in section 301 of the Tariff Act of 1930, which limited free entry for Philippine articles to those coming into the United States by direct shipment under a through bill of lading. According to the House report, *supra*, this was done because of difficulties of administration. It is in accord with decisions holding that an article shipped from one country through another, without entering the commerce of the latter, is an importation from the former. *United States* v. *United Cigar Stores Co.*, 1 Ct. Cust. Appls. 450, T. D. 31505; *United States* v. *F. W. Hagemann*, 39 C. C. P. A. (Customs) 182, C. A. D. 484. It is no indication that Congress intended to extend favored treatment to Philippine products which entered the commerce of or were processed in another country before coming here.

The Philippine Trade Act (section 505) refers to and amends section 2470 (a) (2) of the Internal Revenue Code (26 U. S. C. 2470 (a) (2)), which imposes a special processing tax on coconut oil and combinations or mixtures containing coconut oil. Said section of the Internal Revenue Code (1952 ed.), as amended, provides:

> * * * The additional tax imposed by this paragraph shall not apply when it is established, in accordance with regulations prescribed by the Secretary, that the coconut oil (whether or not contained in a combination or mixture) (A) is wholly the production of the Philippine Islands, any possession of the United States, or the Territory of the Pacific Islands (hereinafter in this paragraph referred to as the "Trust Territory"), or (B) was produced wholly from materials the growth or production of the Philippine Islands, any possessions of the United States, or the Trust Territory: * * *.

It is claimed that this provision was enacted in accordance with a legislative intention to foster the welfare of Philippine copra growers by providing favored treatment for coconut oil derived from Philippine copra; that the purpose of the Philippine Trade Act was to improve the status of Philippine goods; and that, consequently, the term "Philippine article," in the latter statute, should be construed to

include materials such as that at bar. In our view, the above-quoted provision of the Internal Revenue Code militates against, rather than supports, plaintiff's interpretation of the term "Philippine article," since there Congress carefully spelled out an exception for coconut oil produced from materials the growth or production of the Philippines. Had Congress intended in the Philippine Trade Act to include within the term "Philippine article," articles produced in other countries from materials the growth or production of the Philippines, it would have used similar language.

The title of the statute under consideration is the *Phillipine Trade Act*, and, in its preamble, its purpose is stated to be "To provide for trade relations between the United States and the Philippines, and for other purposes." In the House report, *supra*, it is stated that the objective of the bill is the establishment of mutually advantageous trade relations between the United States and the Philippines. The act also provides:

SEC. 509. RIGHTS OF THIRD COUNTRIES.

The benefits granted by this Act and by the executive agreement provided for in Title IV, to the Philippines, Philippine articles or products, and Philippine citizens, shall not, by reason of any provision of any existing treaty or agreement with any third country, be extended to such country or its products, citizens, or subjects.

It is evident that the purpose Congress had in mind in enacting this legislation was to establish trade relations between the Philippines and the United States and to grant certain benefits to the Philippines, but not to extend those benefits to third countries. In the House report, *supra*, it is stated that section 509 "makes clear that the benefits to the Philippines under this act shall be exclusive and shall not be extended to any foreign country."

Pertinent to this discussion is *D. & B. Import Corp.* v. *United States*, 29 C. C. P. A. (Customs) 65, C. A. D. 172, which involved the Cuban Reciprocity Treaty of 1902 and the Cuban Trade Agreement of 1934. In that case, it was held that certain Bacardi rum, manufactured or produced in Cuba, was not entitled to preferential treatment under the said treaty or the said trade agreement in the following situation: Said merchandise had been sold and shipped to Bermuda and there placed in customs bonded warehouse, where it had remained for about 2 years, without being changed in form or condition. It had subsequently been shipped to New York and entered for consumption. The court pointed out in its decision (p. 71):

* * * For the purposes of this case we find it necessary to observe only that when the rum was shipped from Bermuda to the United States it constituted commerce, not between Cuba and the United States, but between Bermuda and the United States. Cuba had lost all jurisdiction over the rum, and while in

bonded warehouse in Bermuda the rum was wholly subject to the jurisdiction of Bermuda, a colony of Great Britain.

In discussing the treaty with Cuba, the court stated (pp. 73–74):

The opening paragraph of the treaty states that the treaty's purpose is to facilitate the commercial intercourse and improve the conditions of trade *between the United States and Cuba*. The respective plenipotentiaries are then recited, and it is then stated that they have "agreed and do hereby agree upon the following articles for the *regulation and government of their reciprocal trade,* namely:—* * *."

\* \* \* \* \* \* \*

It seems clear from the foregoing that the entire treaty is a regulation of commerce between the United States and Cuba, and that it was the intent of the treaty that only such commerce should be affected by its terms. * * *

\* \* \* \* \* \* \*

It will be observed that the rates of duty named in the treaty are granted by the United States *to the Republic of Cuba*. So long as articles the growth or product of Cuba are within its jurisdiction, Cuba is interested in the rates of duty to be levied thereon when imported into the United States from Cuba; but when its products have been sold and exported to another country, Cuba is not interested in having accorded to such products, upon their importation into the United States from such other country, the preferential tariff treatment provided for in the treaty. To grant to such products preferential treatment could affect the trade and commerce of Cuba with the United States only adversely, in that goods of Cuban origin, sold and exported to another country and imported from such country into the United States, might come in competition with like goods sold by Cuban concerns and imported into the United States from Cuba.

\* \* \* \* \* \* \*

Viewing the treaty as a whole, as we are required to do, we are of the opinion that the provision of article II providing for a reduction of 20 per centum from the regular tariff rates upon articles the product of the soil or industry of Cuba, imported into the United States, was clearly intended to be limited to such articles as might become the subject of commerce between the United States and Cuba; or, in other words, the preferential treatment is limited to articles imported into the United States from Cuba. To hold otherwise would, in the instant case, give to Bermuda with respect to some of its commerce a preference which was, by the very terms of the treaty itself, granted only to the Republic of Cuba. [Italics quoted.]

This line of reasoning is applicable to the instant case. The shipment of the imported merchandise from Canada to the United States constituted commerce, not between the Philippines and the United States, but between Canada and the United States. The purpose of the Philippine Trade Act was to establish mutually advantageous trade relations between the United States and the Philippines. The benefits were granted to the Philippines and not to any third country. The Republic of the Philippines has an interest in the tariff status of its products, when imported into the United States from the Philippines, but, when such products have been sold and exported to a third country, it has no interest in having them accorded preferential treat-

ment when subsequently imported into the United States. To grant preferences to such products would not necessarily benefit the Philippine economy, as plaintiff seems to assume, but might affect it adversely, through competition between articles processed in the Philippines and like articles of Philippine derivation processed elsewhere. In any event, it is clear that to extend preferential treatment to the latter would benefit other countries, contrary to the expressed intent of the legislators. We conclude that the benefits provided in the Philippine Trade Act apply to Philippine articles, the subject of commerce between the United States and the Philippines, that is, those imported into the United States from the Philippines, but not to articles of Philippine derivation which have entered the commerce of or been processed in another country before being imported into the United States.

In the instant case, moreover, the article, the growth or product of the Philippines, which was exported to Canada was copra, and the article which was thereafter imported into the United States was copra oil-cake meal obtained from that copra by processing in Canada. The Philippine copra not only entered the commerce of Canada but was made into two other articles, one of which was thereafter imported into the United States.

Plaintiff claims that the copra was not so processed in Canada as to become a new article, but was merely separated into components which retained their Philippine birthmarks, citing cases holding that American goods which have undergone processing abroad may be returned under the duty-free American goods returned provision (paragraph 1615, as amended), when not advanced in value or condition or when produced by a "process of segregation or elimination." *United States* v. *Saunders*, 8 Ct. Cust. Appls. 82, T. D. 37200; *United States* v. *Rubelli's Sons*, 8 Ct. Cust. Appls. 399, T. D. 37645; *United States* v. *Tower & Sons*, 9 Ct. Cust. Appls. 135, T. D. 37981; *Burgess Battery Co.* v. *United States*, 13 Cust. Ct. 37, C. D. 866, appeal dismissed 32 C. C. P. A. 207. It has been pointed out, however, that articles lose their status as American goods if they have been so far changed as to become different articles with new names, characters, and uses. *United States* v. *Tower & Sons, supra; Shell Oil Company of Canada, Limited* v. *United States*, 27 C. C. P. A. (Customs) 94, C. A. D. 68.

In the case last cited, a Canadian corporation purchased crude petroleum from wells in the United States and exported it to its plant at Montreal, where it underwent a "cracking process," by which gasoline was extracted, and a residue, described as "liquid petroleum residue from crude petroleum," remained. The issue was whether

this residue was entitled to free entry as American goods returned. The court held it was not, stating (p. 98):

* * * The first question to be determined is whether the imported merchandise is the merchandise that was exported. If it was the same, advance in value and improvement in condition are of importance; if it was not the same, value and condition are inconsequential here.

For the purpose of this case we proceed upon the theory that had the imported residue been produced in the United States, exported to Canada, and then returned in its precise condition as exported, it would clearly be a product resulting from a manufacturing process applied in the United States. But such is not the situation here.

Appellant carried a product of nature—crude petroleum—into Canada and thereby a process of manufacture separated certain elements of that product from other elements. Appellant's primary object doubtless was to obtain the element known as gasoline, but in the very process of obtaining this element there was also obtained the merchandise involved. That the gasoline *per se* was a resultant of the process and that it was something distinct from the material exported seems clear, and to us it seems equally clear that the residue occupies the same status. The mere fact that it was not the primary article which appellant desired and that, in a sense, it was "unwanted" does not affect its *per se* status as an article resulting from a process of manufacture in Canada, nor does the fact that its production was an unavoidable result of the process used in obtaining the particular article primarily desired affect that status.

In the instant case, the Philippine article, copra, was processed in Canada so as to separate certain elements of that product from other elements. The coconut oil, which was a resultant of the process, is something distinct from the material exported from the Philippines, and the residue, copra oil-cake meal, occupies the same status. The fact that the coconut oil would have been entitled to favored treatment under the special provisions of 26 U. S. C. 2470 (a) (2) does not indicate that such coconut oil or the copra oil-cake meal, for which no special provision is found, are products of the Philippines rather than products of Canada.

An analogous question was presented in the recent case of *Chemo Puro Mfg. Corp.* v. *United States,* 34 Cust. Ct. 8, C. D. 1668, which involved tannic acid produced in the United Kingdom from nutgalls of Chinese origin. The issue was whether the merchandise was entitled to entry at the reduced rate provided for in the General Agreement on Tariffs and Trade, T. D. 51802 (paragraph 1), which reduced rate was not applicable to articles imported directly or indirectly into the United States from any part of China under Communist domination, T. D. 52788. The court held that the merchandise was not an importation, directly or indirectly, from China, but an importation from the United Kingdom, stating:

The merchandise here in question, in its condition as imported, is tannic acid, not nutgalls. The identity of the nutgalls, produced in China, has been lost, and a new product with a new name, a new use, and a distinct tariff status has been produced in the United Kingdom, the country of exportation. The imported tannic acid is, therefore, an article the growth, produce, or manufacture of the United Kingdom and dutiable as such.

In the instant case, the processing in Canada resulted in a new product, copra oil-cake meal, having a new name, character, use, and tariff status from copra, the article produced in the Philippines. It is a product of Canada and not a product of the Philippines.

For the reasons stated, we hold that the merchandise involved herein is not a "Philippine article" within the meaning of that term, as defined in the Philippine Trade Act, and is not entitled to free entry under that act. The motion to dismiss the protest is, therefore, granted. Judgment will be rendered accordingly.