**Slip Op. 00-121**

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| | : | |
| PRECISION SPECIALTY METALS, INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | Before: WALLACH, Judge |
| v. | : | Court No.: 98-02-00291 |
| | : | |
| | : | |
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Defendant. | : | |
| | : | |
| | : | |

[Defendant's motion for reconsideration GRANTED in part and DENIED in part. Plaintiff's motion for summary judgment DENIED.]

Decided: September 20, 2000

Collier Shannon Scott PLLC, Washington, DC (Laurence J. Lasoff, Robin H. Gilbert, John M. Herrmann); Howrey, Simon, Arnold & White, Washington, DC (Jeffrey W. Brennan), for Plaintiff.

David W. Ogden, Assistant Attorney General; Joseph I. Liebman, Attorney in Charge, International Trade Field Office; Mikki Graves Walser, Commercial Litigation Branch, Civil Division, Department of Justice, New York, New York; Chi S. Choy, Office of the Assistant Chief Counsel, International Trade Litigation, United States Customs Service, New York, New York, of counsel, for Defendant.

## OPINION

**WALLACH, Judge.**

## I.

### Preliminary Statement

This case comes before the court on Defendant's Motion for Reconsideration and/or Relief

From the Court's Order Dated May 24, 2000 (the "Reconsideration Motion"), and on Plaintiff's

Motion for Summary Judgment Pursuant to United States Court of International Trade Rule 56

("Plaintiff's Motion for Summary Judgment").

The Order dated May 24, 2000 struck Defendant's Opposition to Plaintiff's Motion for

Summary Judgment and Cross-Motion for Summary Judgment, and the related papers filed therewith,

as untimely filed, and granted summary judgment in favor of Plaintiff as Plaintiff's Motion for Summary

Judgment was thus unopposed. In the Reconsideration Motion, Defendant asks the court to accept its

late-filed submissions on summary judgment. In the alternative, Defendant urges the court to make an

independent analysis of the merits of Plaintiff's Motion for Summary Judgment. For the reasons set

forth below, the court grants the Reconsideration Motion to the extent that it seeks an independent

analysis by the court of Plaintiff's Motion for Summary Judgment. The court denies the remainder of

the Reconsideration Motion.

In its Motion for Summary Judgment, Plaintiff Precision Specialty Metals, Inc. ("Precision")

contests Customs' denial of drawback on certain entries of stainless steel trim[1] and scrap. Customs

---

[1]       Plaintiff has failed to provide the court with evidence as to the precise nature of the merchandise as to which drawback was denied, and the record is ambiguous on this point. In its brief, Plaintiff asserts that

> two types of non-prime material . . . are at issue in this litigation. . . . "[S]econdary material" . . . consists of stainless steel sheet and strip that due to surface or other minor defects is not suitable for the same uses as the "prime" product. . . . By far, the majority of PSM's drawback claims at issue involve stainless steel scrap [which] . . . is material that cannot be used in applications similar to prime product, but rather is suitable only for use as remelting stock for further production of stainless steel products and is sold at a price lower than secondary material.

based its denial on a determination that the subject merchandise is "waste" or "valuable waste", and

thus is not an "article manufactured or produced" within the meaning of the drawback statute, 19

U.S.C. § 1313(b) (1994). Plaintiff contends that, as a matter of fact and of law, the merchandise at

issue is not waste, and that Plaintiff is entitled to drawback thereon. Because the court concludes that

---

Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment ("Plaintiff's Brief") at 7-8, n.3 (record citation omitted). In its letter to Customs expressing its intention to adhere to the terms of the drawback contract, Plaintiff sought drawback on "stainless steel coils, sheets and trim". Appendix Accompanying the Memorandum of Law In Support of Plaintiff's Motion for Summary Judgment ("App.") A-1 (Letter from Precision to Customs declaring intention to adhere to terms of T.D. 81-74, dated October 23, 1991) at 1. Customs, in its denial of drawback in connection with the entries at issue, described the merchandise at issue as "scrap". App. A-20 at 1. Plaintiff's protest forms do not identify the nature of the merchandise at issue. In its Memorandum in Support of Protest and Application for Further Review, Plaintiff does not specifically describe the merchandise. It repeatedly refers to the merchandise at issue as "trim", apparently to bolster an argument (abandoned here) that the merchandise at issue falls precisely within the wording of the drawback contract approved by Customs, which included "trim". Plaintiff stated, in its unrefuted statement pursuant to USCIT Rule 56(i), that documents (which have not been placed before the court) submitted in connection with the merchandise at issue described the merchandise as "stainless steel", "stainless steel scrap", "metal scrap", "scrap steel for remelting purposes only", "steel scrap sabot", and "desperdicio de acero inoxidable". Plaintiff's Brief, Annex Pursuant to U.S. CIT R. 56(i) ("Rule 56(i) Statement"), at ¶ 18. Also in that statement, Plaintiff repeatedly states that the merchandise at issue is "stainless steel scrap". Id. at ¶¶ 18-24.

Plaintiff has not provided evidence as to whether the merchandise in fact consisted of all or some of these, nor has it provided sufficient evidence regarding the distinctive characteristics and uses of these various items – distinctions which, as noted below, may require varying results for varying goods. Evidence submitted by Plaintiff tends to indicate that scrap and trim differ in ways that are material to the determination of this action. See App. A-21 (Affidavit of Robert E. Heaton, sworn to on September 5, 1996) at 3, ¶ 5 ("The differences in nomenclature [between sheet, coils, trim, or scrap] largely reflect the differences in end use of the residual material within the steel consuming community."); App. G (Transcript of Deposition of Robert E. Heaton taken January 20, 2000) at 43 ("[P]rime stainless steel [is] what you ordered . . . . [I]f I cut off trim . . . which is too narrow or some size reason that it can't be sold as secondary as a market, then it will become scrap. . . . The intermediate position is secondary where there are the strip that we trim off or a sheet we trim off a coil, whatever it is, trim, strip or sheet . . . ."). Trim apparently has a market for use other than as scrap, as does "secondary". This ambiguity presents an issue which requires elucidation at trial.

Plaintiff has failed to meet its burden on summary judgment to demonstrate the absence of any genuine issue of material fact, Plaintiff's Motion for Summary Judgment is denied.

## II.

## Background

### A.

### Facts

This case involves 38 claims for substitution manufacturing drawback made pursuant to 19 U.S.C. § 1313(b), the manufacturing substitution drawback statute, and Treasury Decision ("T.D.") 81-74. T.D. 81-74 is a general drawback contract for articles manufactured using steel, and provides, in pertinent part, for the allowance of drawback on imported "[s]teel of one general class, e.g. an ingot", where the "merchandise . . . which will be used in the manufacture of the exported products" is "[s]teel of the same general class, specification and grade as the [subject imported] steel[.]" The steel used in the manufacture of the exported products on which drawback is sought must be "used to manufacture new and different articles, having distinctive names, characters and uses." T.D. 81-74 further provides that "no drawback is payable on any waste which results from the manufacturing operation."

On October 23, 1991, Precision submitted a letter to Customs expressing its intention to adhere to and comply with the terms of T.D. 81-74. See App. A-1. In that letter, Precision described the various steel products on which it would claim drawback. Those products included "stainless steel coils, sheets and trim" of various chemistries identified by industry standards. Id. at 1. Customs

granted Precision's request to claim drawback under T.D. 81-74.[2] App. A-4 (Letter from Customs to Precision, dated January 10, 1991 [sic -- 1992]).

Precision filed 116 drawback entries under T.D. 81-74 between December 11, 1991 and May 13, 1996. Rule 56(i) Statement, ¶ 5. Customs liquidated 69 of these entries with full benefit of drawback, in which Precision had claimed exports of stainless steel trim, stainless steel strip, stainless steel scrap and stainless steel coils, for a total of approximately $850,000. Id. at ¶ 6. Over that period, Customs routinely requested clarifying information concerning Precision's drawback entries. Id. at ¶ 7. Prior to January 1996, Customs never questioned the eligibility of that merchandise for drawback. Id. at ¶ 7.

Documentation submitted in connection with the remaining entries, which contained the merchandise at issue, described the merchandise by various terms such as "stainless steel," "metal scrap," "scrap steel for remelting purposes only," "steel scrap sabot," "stainless steel scrap," and "desperdicio de acero inoxidable[3]." Id. at ¶ 18. See App. B at 2.

During 1992 and 1993, when conducting "pre-liquidation reviews" of three drawback claims that involved exports of "[s]tainless [s]teel coil ends and side trim (scrap)", Customs asked Precision

---

[2]      On July 26, 1993, Precision notified Customs of a change in the terms of its authority to operate under T.D. 81-74 concerning the names of officers of the company who would sign drawback documents on the company's behalf. App. A-5 (Letter from Precision to Customs, dated July 26, 1993). Customs approved this amendment by letter of September 7, 1993 without prejudice to any existing drawback claims on file. App. A-6 (Letter from Customs to Precision, dated September 7, 1993).

[3]      Customs translated this term as "stainless steel waste". App. B (Customs HQ Ruling 227373, dated Oct. 10, 1997) at 2. Plaintiff has not submitted any evidence to contradict this translation.

for additional information and documentation on the exports involved. App. A-8 (Letter from Customs

to Pat Revoir dated July 10, 1992); App. A-11 (Letter from Gary Appel to Customs dated July 22,

1992). In response, Precision furnished Customs with additional information and documentation,

showing that the exported material was stainless steel scrap. Customs liquidated each of those three

drawback entries for the full amount of drawback claimed. See App. A-14 (Notice of Liquidation);

Rule 56(i) Statement, ¶¶ 8-10.

In January 1996, Customs first questioned the eligibility of Precision's claims involving stainless

steel trim for drawback. See Rule 56(i) Statement, ¶ 7; App. A-7 (January 10, 1996 notice from

Customs to Appel-Revoir). In June 1996, Precision received a Notice of Action informing it that 38 of

its drawback entries were being liquidated without the benefit of drawback in full or part, on the basis

that "scrap was shown on the export bill(s) of lading" and that "[d]rawback is not available upon

exports of valuable waste."[4] App. A-20. The entries at issue were liquidated on June 14, 1996. Rule

56(i) Statement, ¶ 14.

**B.**

**Procedural History**

On September 10, 1996, Precision filed a timely protest covering the entries at issue in this

---

[4] When required to state the "complete factual basis supporting the U.S. Customs Service's determination that entries filed by or on behalf of the Plaintiff claiming drawback on the merchandise at issue are not eligible for drawback", Customs responded that "[t]he merchandise in issue is either waste or valuable waste. Neither waste nor valuable waste are manufactured or produced. Accordingly, the exportation of the merchandise in issue is not eligible for drawback." See App. C (Plaintiff's First Set of Interrogatories and First Request for Production of Documents (Interrogatory No. 15) and Defendant's Responses thereto (response to Interrogatory No. 15)).

matter. See Rule 56(i) Statement, ¶ 15. Customs denied Precision's protest. Id., ¶ 16. Precision thereafter timely commenced this action by filing a summons on February 5, 1998. Precision filed its complaint on October 21, 1998.

On July 26, 1999, the court issued a scheduling order, setting the close of discovery for December 31, 1999. On January 4, 2000, the court granted the parties' consent motion for an extension of the discovery cutoff, and extended the cutoff to February 29, 2000.

At a status conference held March 2, 2000, Defendant stated that it had not yet completed its discovery efforts (which commenced shortly before the already-extended discovery cutoff date), and indicated that it wished to seek the court's permission to conduct further discovery. That day, the court issued a scheduling order (the "March 2 Order"), setting a March 9, 2000 deadline for Defendant to file any motion for limited additional discovery. This order also set a deadline of April 3, 2000 for Plaintiff to file a motion for summary judgment. Defendant was given 30 days in which to file any opposition and/or cross-motion to plaintiff's summary judgment motion. Plaintiff was given 10 days in which to file any reply brief. Trial was set for June 19, 2000, in the event that all issues were not resolved on summary judgment. On March 14, 2000, the court issued an order modifying the March 2 Order. This March 14 order granted Plaintiff 30 days in which to file reply papers in the event the Defendant filed a cross-motion, and provided that trial would be rescheduled if a cross-motion were filed.

On April 11, 2000, the court issued an order partially granting Defendant's motion for additional discovery, and providing that Defendant was to complete any such discovery no later than April 25, 2000.

Plaintiff filed its Motion for Summary Judgment on March 31, 2000.[5] Thus, by the terms of the March 2 Order, Defendant was required to file any opposition and/or cross-motion papers no later than May 5, 2000.

On May 4, 2000, at 5:51 p.m., Defendant filed Defendant's Motion to Extend the Time Within Which to File Its Response to Plaintiff's Motion for Summary Judgment ("Defendant's Motion for Extension"), seeking a thirty-day extension of time in which to file its opposition to Plaintiff's Motion for Summary Judgment. Defendant's Motion for Extension, and the supporting papers, contained no request for an extension of time for Defendant to file a cross-motion for summary judgment.

On May 10, 2000, the court issued an order denying Defendant's Motion for Extension and requiring Defendant to file any opposition to Plaintiff's Motion for Summary Judgment "forthwith".

On May 19, 2000 (two weeks after the date on which Defendant's opposition papers should have been filed), Plaintiff filed Plaintiff's Motion for Establishment of a Hearing Schedule, If Necessary, on Plaintiff's Motion for Summary Judgment ("Plaintiff's Motion for Hearing Schedule"). In this motion, Plaintiff urged that briefing on its Motion for Summary Judgment should be held to be closed, in light of the fact that Defendant had yet to file any papers opposing summary judgment. Also on May 19, 2000, the court issued an order scheduling an in-court status conference.

On May 22, 2000, at 5:24 p.m. -- the night before the conference set for Plaintiff's Motion for Hearing Schedule -- Defendant filed its Opposition to Plaintiff's Motion for Summary Judgment and Cross-Motion for Summary Judgment, Defendant's Statement of Material Facts As To Which There Is

---

[5] The papers were actually filed on April 6, 2000, but were deemed filed as of March 31, 2000.

No Genuine Issue To Be Tried, Defendant's Memorandum in Opposition to Plaintiff's Motion for Summary Judgment and In Support of Defendant's Cross-Motion for Summary Judgment, and Defendant's Response to Plaintiff's Annex Pursuant to U.S. CIT Rule 56(i) (collectively, "Defendant's Opposition Papers").

On May 23, 2000, the court held an in-court status conference. During that conference, the court heard argument regarding Plaintiff's Motion for Hearing Schedule, including that part of the motion that asked the court to close briefing on Plaintiff's Motion for Summary Judgment. On May 24, 2000, the court issued an order (the "May 24 Order") striking Defendant's Opposition Papers from the record, granting Plaintiff's Motion for Summary Judgment as unopposed, directing Plaintiff's counsel to file proposed findings of fact and conclusions of law and a proposed form of judgment, and canceling the trial previously scheduled for June 20, 2000.

On June 2, 2000, Defendant filed the instant Reconsideration Motion, seeking reconsideration and/or relief from those portions of the May 24 Order that (1) struck Defendant's Opposition Papers as untimely filed, and (2) granted Plaintiff's Motion for Summary Judgment as unopposed.

On June 16, 2000, the court issued an order which, in pertinent part, denied the Reconsideration Motion insofar as it sought reconsideration of that part of the May 24 Order which struck Defendant's Cross-Motion for Summary Judgment as untimely filed. As noted in the June 16 Order, that part of the Reconsideration Motion is baseless. By order dated March 2, 2000, Defendant was required to file any cross-motion no later than May 5, 2000. Defendant's Motion for Extension, and the supporting papers, contained no request for an extension of time for Defendant to file a cross-motion. Defendant never moved for an extension of time in which to file a cross-motion for summary

judgment, and there was no decision on that issue to be reconsidered.  The June 16 Order thus limited

oral argument to the remaining aspects of the Reconsideration Motion.  The issues embraced therein

are discussed below, and are followed by a discussion of Plaintiff's Motion for Summary Judgment.

### III.

### Analysis of Defendant's Reconsideration Motion

### A.

### Defendant's Opposition Papers Were Untimely Filed

Defendant asks the court to reconsider that part of the May 24 Order that struck Defendant's

Opposition Papers.[6]  As grounds for reconsideration, Defendant urges that the term "forthwith", as

used in the May 10 Order denying Defendant's Motion for Extension, was ambiguous, and asserts that

the May 22, 2000 filing of Defendant's Opposition Papers was timely under a reasonable interpretation

of the May 10 Order.  The factual basis for this argument is unsupported by the record; its legal

premise is without sufficient authority to persuade this court that it has merit.

Defendant filed its Opposition Papers seventeen days after the date those papers were due

under the March 2 Order, and twelve days after the court denied Defendant's Extension of Time

Motion.  Defendant thus effectively granted itself a seventeen-day extension, although the court denied

its request for a thirty-day extension.  Defendant contends that its belated filing fell within a reasonable

---

[6]      As used in the discussion below, the term "Defendant's Opposition Papers" does not include the aspects of those papers that cross-move for summary judgment.  As previously noted, Reconsideration Motion was denied as to Defendant's Cross-Motion, by Order dated June 16, 2000.

interpretation of the definition of "forthwith".[7]

> Defendant cites Black's Law Dictionary, which defines "forthwith" as:
>
> Immediately; without delay; directly; within a reasonable time under the circumstances of the case; promptly and with reasonable dispatch. U.S. ex rel. Carter v. Jennings, D.C.Pa., 333 F.Supp. 1392, 1397. Within such time as to permit that which is to be done, to be done lawfully and according to the practical and ordinary course of things to be performed or accomplished. The first opportunity offered.

Black's Law Dictionary 654 (Sixth Ed. 1990). Defendant also cites judicial constructions of the term. Many of these examine the use of "forthwith" in the context of the Suits in Admiralty Act ("SAA"), 46 U.S.C. § 742 (1988), which requires service on the United States Attorney "forthwith". In that context, Libby v. United States, 840 F.2d 818, 821 (11th Cir. 1988), defines the term to require action with "reasonable promptness, diligence or dispatch" (quoting U.S. v. Bradley, 428 F.2d 1013, 1015-16 (5th Cir. 1970)), and notes that "in assessing the reasonableness of the speed with which one acts it is essential to consider the act which one is performing." Justice Thomas, in dissenting to the Supreme Court's holding in Henderson v. United States, 517 U.S. 654 (1996), observed that "[a]lthough we have never undertaken to define 'forthwith' as it is used in the SAA, it is clear that the term 'connotes action which is immediate, without delay, prompt, and with reasonable dispatch.'" Id., 517 U.S. at 680 (citations omitted).

---

[7] Defendant claimed at oral argument that its counsel was unsure of the meaning of the word "forthwith" and therefore consulted Black's Law Dictionary and several case authorities. Such action fails to meet this court's expectations of a minimum practice standard. If counsel has been ordered to perform an act, in an order which includes a word subject to reasonable definition as requiring immediate action, counsel is well advised to either perform that act immediately or to seek clarification from the court. What counsel cannot safely do is choose the definition which best suits its convenience, and rest on its own decision.

Defendant noted that the Second Circuit stated in <u>City of New York v. McAllister Bros., Inc.</u>, 278 F.2d 708 (2d Cir. 1960), that "'[f]orthwith' means immediately, without delay, or as soon as the object may be accomplished by reasonable exertion." <u>Id.</u>, 278 F.2d at 710. Defendant omitted, however, the following sentence which the court finds particularly instructive: "The Supreme Court has said of the word that '<u>in matters of practice</u> and pleading <u>it is usually construed</u>, and sometimes defined by rule of court, <u>as within twenty-four hours</u>.' <u>Dickerman v. Northern Trust Co.</u>, 1900, 176 U.S. 181, 193 . . . ." <u>Id.</u> (emphasis added).

The common thread running through the case law and the definition quoted from <u>Black's</u> is a paramount emphasis on immediacy, under the attendant circumstances. Indeed, Defendant's counsel indicated at oral argument that she understood the term "forthwith" to mean "immediately":

> I understand and appreciate that "forthwith"means immediately, I do appreciate that, and that is why so much of my time was dedicated to preparing our cross motion, what "forthwith" means though, in terms of days, I didn't know.[8]

Transcript of oral argument at Status Conference on May 23, 2000, at 14.

Further resort to <u>Black's Law Dictionary</u> reveals the following definition of the word "immediately", which is the first word appearing in the Defendant's definitions of the word "forthwith":

> Without interval of time, without delay, straightway, or without any delay or lapse of time. Drumbar v. Jeddo-Highland Coal Co., 155 Pa. Super. 57, 37 A.2d 25, 27. When used in contract is usually construed to mean "within a reasonable time having due regard to the nature of the circumstances of the case", although strictly, it means "not deferred by any period of time". Integrated, Inc. v. Alec Fergusson Elec. Contractors, 250 C.A.2d 287, 58 Cal.Rptr. 503, 508, 509. <u>The words "immediately" and "forthwith" have generally the same meaning. They are stronger than the</u>

---

[8] The court notes that any such uncertainty could have been resolved immediately through a request by counsel for clarification.

expression <u>"within a reasonable time" and imply prompt, vigorous action without any delay</u>. Alsam Holding Co. v. Consolidated Taxpayers' Mut. Ins. Co., 4 N.Y.S.2d 498, 505, 167 Misc. 732.

<u>Black's Law Dictionary</u> 750 (Sixth Ed. 1990) (emphasis added).

A delay of seventeen days in performing an act for which the court had rejected an extension of thirty days is outside the meaning of the term forthwith in the context of the court's May 10 Order. Defendant's Opposition Papers were not filed "immediately". Indeed, the seventeen-day delay does not even demonstrate "reasonable dispatch", particularly in light of the court's denial of the requested extension. For this reason, Defendant's Reconsideration Motion is denied insofar as it seeks to have the court accept its late-filed Opposition Papers. The court now turns to the remaining aspect of the Reconsideration Motion.

**B.**

**Plaintiff's Motion For Summary Judgment
Should Be Assessed On Its Merits**

Defendant argues that, even if the court declines to accept its late-filed Opposition Papers, the court must assess the merits of Plaintiff's Summary Judgment Motion prior to granting summary judgment. Plaintiff concedes the point.[9]

"Summary judgment is warranted when, based upon the 'pleadings, depositions, answers to interrogatories, . . . admissions on file, . . . [and] affidavits, if any,' the court concludes that there is no

---

[9] "USCIT R. 56(e) indicates that, prior to entering a final judgment in favor of the plaintiff, the Court must determine that Precision Specialty Metals' submissions in support of its Motion for Summary Judgment entitle it to relief." Plaintiff's Opposition to Defendant's Motion for Reconsideration and/or Relief From the Court's Order Dated May 24, 2000, at 3.

genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law."

Peg Bandage, Inc. v. United States, 17 CIT 1337, 1339 (1993) (quoting Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 247-48 (1986)).  Under this standard, the court must reach a conclusion that there

is no factual issue and that the applicable laws warrant judgment in favor of the movant; absent such a

conclusion, there can be no summary judgment.  This rule is underscored by the wording of USCIT

Rule 56(e), which provides, in pertinent part, that where a motion for summary judgment is unopposed,

"summary judgment, if appropriate, shall be entered against the adverse party."  Id. (emphasis added).

Plainly, summary judgment may not be entered if it is not "appropriate", and that determination is a

function of the court.

On a motion for summary judgment, the movant bears the burden of demonstrating[10] that there

is no genuine issue of material fact.  United States v. F. H. Henderson, Inc., 10 CIT 758, 760 (1986)

(citing SRI Int'l v. Matsushita Electric Corp. of America, 775 F.2d 1107, 1116 (Fed. Cir. 1985)).  If

that burden is not met, there can be no grant of summary judgment.  The courts are also under an

obligation to view the evidence in a light most favorable to the nonmovant, and to draw all reasonable

inferences in its favor.  Id.  This obligation does not depend on the presence of opposition papers from

---

[10]     USCIT Rule 56(h) requires the summary judgment movant to "annex[] to the motion a separate, short and concise statement of the material facts as to which the moving party contends there is no genuine issue to be tried."  The party opposing summary judgment must then file "a separate, short and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried."  Id.  "All material facts set forth in the statement required to be served by the[] moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party."  Id.  See United States v. Continental Seafoods, Inc., 11 CIT 768, 773-74, 672 F. Supp. 1481, 1486-87 (1987); United States v. Menard, Inc., 16 CIT 410, 414, 795 F. Supp. 1182, 1185-86 (1992).  Plaintiff's factual assertions in its 56(i) statement are thus admitted for the purpose of this summary judgment motion and do not require full substantiation in the record.

the nonmovant.

These well-recognized standards demonstrate that lack of opposition is not, standing alone, a sufficient basis for granting a summary judgment motion. The court's order of May 24, 2000, was thus to that extent in error, and accordingly, the court grants that portion of Defendant's Reconsideration Motion which asks the court to independently review Plaintiff's Motion for Summary Judgment. The following portion of this Opinion constitutes that review.

## IV.

### Analysis of Plaintiff's Motion for Summary Judgment

### A.

### Standard of Review

The court subjects this unopposed motion for summary judgment to the usual standard on summary judgment, outlined above. In doing so, the court reviews Customs' denial of Plaintiff's protest de novo. See Rheem Metalurgica S/A v. United States, 20 CIT 1450, 1456, 951 F. Supp. 241, 246 (1996), aff'd 160 F.3d 1357 (Fed. Cir. 1998). Although the decision of the Customs Service is presumed correct and "[t]he burden of proving otherwise shall rest upon the party challenging such decision," the court's role in reviewing the decision is to reach the correct result. 28 U.S.C. § 2639(a)(1) (1994); see also Jarvis Clark Co. v. United States, 733 F.2d 873, 878 (Fed. Cir.1984). The court will therefore consider this matter de novo to reach the proper result. Thus, the court will sustain Customs' decision if it is proper, even if the rationale is not articulated in Customs' decision.

Customs' decision on Plaintiff's protest relies in part on its regulations enacted to implement the

provisions of the drawback statute.  If that statute is clear on its face, the court must follow

Congressional intent, regardless of the existence of an interpretation by Customs to the contrary.

Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 842-43 (1984).  If

the statute is ambiguous, an agency interpretation embodied in the implementing regulations is entitled to

deference, as is an agency interpretation arrived at following a formal adjudication.  Id., 467 U.S. at

843-44; Christensen v. Harris County, __ U.S. __, 120 S. Ct. 1655, 1662 (2000).  Such deference is

only warranted, however, if the agency's interpretation is based on a permissible construction of the

statute, in light of the language, policies and legislative history of the statute.  See Chevron, 467 U.S. at

843; Corning Glass Works v. United States, 799 F.2d 1559, 1565 (Fed. Cir. 1986).  To the extent

that Customs' regulation is ambiguous, deference to Customs' interpretation of that regulation is entitled

to deference as well.  Christensen, 120 S. Ct. at 1662; Auer v. Robbins, 519 U.S. 452, 461 (1997).

**B.**

**Plaintiff Has Failed to Demonstrate That Steel Scrap is Subject to Drawback**

Plaintiff claims drawback under 19 U.S.C. § 1313(b), which provides that:

**(b) Substitution for drawback purposes**

If imported duty-paid merchandise and any other **merchandise** (whether imported or
domestic) of the same kind and quality are **used in the manufacture or production of
articles** within a period not to exceed three years from the receipt of such imported
merchandise by the manufacturer or producer of such articles, **there shall be allowed
upon the exportation**, or destruction under customs supervision, **of any such
articles**, notwithstanding the fact that none of the imported merchandise may actually
have been used in the manufacture or production of the exported or destroyed articles,
**an amount of drawback** equal to that which would have been allowable had the
merchandise used therein been imported . . . . (emphasis added).

A manufacturer seeking to avail itself of the drawback privilege must comply with applicable rules and

regulations. <u>See</u> 19 U.S.C. § 1313(l); 19 C.F.R. § 191.23(d) (1996); 19 C.F.R.

§ 191.45 (1996). Among other things, the regulations provide that "each manufacturer . . . shall apply

for a specific drawback contract by submitting a drawback proposal." 19 C.F.R.

§ 191.21(a) (1996). This is not a question of whether a party has satisfied a commercial contract; this

case presents a claim for "exemption from duty, a statutory privilege due only when enumerated

conditions are met." <u>Guess? Inc. v. United States</u>, 944 F.2d 855, 858 (Fed. Cir. 1991). "'Such a

claim is within the general principle that exemptions must be strictly construed, and that doubt must be

resolved against the one asserting the exemption.'" <u>Id.</u> (quoting <u>United States v. Allen</u>, 163 U.S. 499,

504 (1896)).

**1.**

**Customs' Decision**

Customs determined that the stainless steel scrap at issue is "valuable waste" under the terms of

the drawback contract, and thus not an article that is manufactured or produced within the meaning of §

1313(b). App. B at 5. Customs cited 19 C.F.R. § 191.22(a)(2) (1996), which provides that "[i]n

liquidating the drawback entry, the quantity of imported duty-paid merchandise or drawback products

used will be reduced by an amount equal to the quantity of merchandise the value of the waste would

replace." App. B at 3; <u>see also</u> 19 C.F.R. § 191.32(b) (1996). Indeed, as Customs noted, since

1936 it has expressly required exclusion of the value of valuable waste from the amount of drawback.

<u>See</u> App. B at 3.[11]

---

[11]    Plaintiff attacks Customs' reference to its longstanding policy of excluding waste from
drawback computation. Specifically, Plaintiff disputes Customs' reliance on <u>United States v. Dean</u>

Customs also cited C.S.D. 80-137, <u>Drawback: Whether Drawback is Allowable on Valuable Waste Incurred in Manufacture</u>, 14 Cust. B. & Dec. 941 (Oct. 22, 1979). <u>Id.</u> That decision involved a manufacturer's application for drawback on the exportation of a valuable waste byproduct which resulted from the manufacture of steel rolled coils. Customs noted that drawback is allowable on exports of byproducts, but not on exports of valuable wastes. <u>Id.</u> at 941. Customs distinguished wastes, which result from "a 'process of segregation or elimination,'" from byproducts, which are produced by a "'process of manufacture or other means.'" <u>Id.</u> at 942 (quoting <u>Burgess Battery Co. v. United States</u>, 13 Cust. Ct. 37 (1944)). Customs ultimately ruled that "the waste is the residue from steel slabs used to manufacture something else (rolled coils) rather than an article manufactured." <u>Id.</u>

Plaintiff claims that Customs erred in its determination and argues that, as a factual matter and as a matter of industry terminology, stainless steel scrap is not "waste", but is an article manufactured or produced within the meaning of §1313(b). Plaintiff cites to numerous items in the record before the court which support the conclusion that stainless steel scrap is created during the same manufacturing process that produces Plaintiff's primary products. The court accepts this undisputed evidence as established fact for the purpose of the instant motion. Nevertheless, Plaintiff has failed to provide the court with a legal definition of any of the governing statutory and regulatory terms, nor has Plaintiff

---

<u>Linseed-Oil Co.</u>, 87 F. 453, 456 (2d Cir. 1898), <u>National Lead Co. v. United States</u>, 252 U.S. 140, 144-45 (1920) and <u>Seeberger v. Castro</u>, 153 U.S. 32, 35 (1894). <u>See</u> Plaintiff's Brief at 26-27. Plaintiff argues, correctly, that none of these cases rests its holding on the issue of whether drawback is payable on the exportation of waste. <u>See</u> <u>id.</u> These cases do, however, reference the historical distinction between waste and manufactured articles, in the drawback context and otherwise. Moreover, that historical distinction in the drawback context is amply reflected in other decisions, some of which are detailed below.

advanced any legal basis upon which the court can conclude that the industry understanding of the terms at issue should govern. Plaintiff has not cited any judicial or administrative definition of the terms "manufactured", "produced" or "waste" in a general context, in the drawback context, or in the context of the steel industry.

The court is thus called upon to determine whether stainless steel scrap is an "article" "manufactured" or "produced" within the meaning of § 1313(b). The court must also construe the meaning of the term "valuable waste" for purposes of the related regulations and T.D. 81-74.

When a word is undefined in a statute, the agency and the reviewing court normally give the undefined term its ordinary meaning. <u>See</u> <u>Perrin v. United States</u>, 444 U.S. 37, 42 (1979) ("A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning."). "To assist it in ascertaining the common meaning of a tariff term, the court may rely upon its own understanding of the terms used, and it may consult lexicographic and scientific authorities, dictionaries, and other reliable information sources." <u>Brookside Veneers, Ltd. v. United States</u>, 847 F.2d 786, 789 (Fed. Cir. 1988).

Review of these sources, and judicial and administrative interpretations of the terms at issue, reveals a venerable distinction between waste and "manufactured" or "produced" articles, particularly in the tariff context.

**2.**

**Definitions of the Terms at Issue**

The court first looks to dictionary definitions as indicators of the common and popular meaning of the terms at issue. Webster's Third New International Dictionary (1986) (hereinafter "Webster's

Dictionary") defines the term "article", in pertinent part, as "**5 :** a material thing **:** ITEM, OBJECT <~*s* of

diet> <scarce ~*s* command high prices>."   Webster's Dictionary 123.  "[I]n a tariff sense, the term

'articles' is sufficiently comprehensive to include . . . 'almost every separate substance or material,

whether as a member of a class, or as a particular substance or commodity,' except where the

Congress has indicated that the term shall have a narrower signification."  Lussky, White & Coolidge,

Inc. v. United States, 21 CCPA 201, 202 (1933) (quoting Junge v. Hedden, 146 U.S. 233, 238

(1892)); see also United States v. Eimer & Amend, 28 CCPA 10 (1940) (providing a review of other

decisions analyzing the use of the term "article" in the tariff statutes).

The court must determine whether Congress has indicated a narrower signification by the use of

the terms "manufactured" or "produced," which would distinguish "waste" from such "articles".

Webster's Dictionary offers the following pertinent definitions of the term "manufactured":

> [1]**manufacture** . . . **1 :** something made from raw materials by hand or by machinery <
> hemp and tow cloth were familiar household ~*s* –V.S. Clark >
> < imports most ~*s* used by consumers or needed for internal development –D.L. Cohn
> > **2a :** the process or operation of making wares or other material products by hand or
> by machinery esp. when carried on systematically with division of labor < families
> engaged in domestic ~ often lived and worked in one room –J.W. Krutch > < the ~ of
> furniture > < steel ~>
>
> * * *
> [2]**manufacture** . . . **1 :** to make (as raw material) into a product suitable for use <the
> wood . . . is *manufactured* into fine cabinetwork –*Amer. Guide Series: Oregon* > <
> ~ iron into steel> **2a :** to make from raw materials by hand or by machinery

Webster's Dictionary at 1378.  Not surprisingly, Webster's definition of the term "produce" bears a

close resemblance to that of "manufacture":

> **8a :** to give being, form, or shape to **:** make often from raw materials : MANUFACTURE
> < *produced* 5,002 cars in three years –*Amer. Guide Series: Mich.* > **b** to make

economically valuable **:** make or create so as to be available for satisfaction of human wants **9 :** to cause to accrue **:** bring in as profit < money at interest ~*s* an income ~ *vi* **:** to bring forth a product or production **:** bear, make, or yield that which is according to nature or intention **:** grow, make, or furnish economically valuable products < labored literally day and night to ~ –Vera M. Dean >

Id. at 1810. "Waste" has been extensively defined in Webster's Dictionary, which offers the following

pertinent definition:

> **4a:** damaged, defective, or superfluous material produced during or left over from a manufacturing process or industrial operation; material not usable for the ordinary or main purpose of manufacture**:** as **(1)** material rejected during a textile manufacturing process and either recovered for reworking (as yarn) or used usu. for wiping dirt and oil from hands and machinery (2) **:** SCRAP

Id. at 2580.

The courts, and the Customs Service, have had numerous occasions to construe these terms, in

varying tariff contexts[12]. "Manufacture implies a change, but every change is not manufacture, and yet

every change in an article is the result of treatment, labor, and manipulation. But something more is

---

[12] The opinion in National Juice Products Assoc. v. United States, 10 CIT 48, 58 n.14, 628 F. Supp. 978, 988 n.14 (1986) reviews the similarity between the "article manufactured or produced" drawback analysis and the analysis required by two other statutory programs. See also Tropicana Products, Inc. v. United States, 16 CIT 155, 159, 789 F. Supp. 1154, 1157 (1992) (noting parallel analyses under the several programs, but underscoring need for mindfulness of the differing underlying statutory purposes in applying the standards). To qualify for duty free treatment under the Generalized System of Preferences, an article must be "[s]ubstantially transformed in the beneficiary developing country into a new and different article of commerce." 19 C.F.R. § 10.177(a)(2) (1996); see Torrington Co. v. United States, 764 F.2d 1563, 1568 (Fed. Cir. 1985). Country-of-origin marking requirements under 19 U.S.C. § 1304 (1994) depend on whether the manufacturer subjects imported merchandise to a "substantial transformation . . . even though the process may not result in a new or different article," subsequent to entry into the United States. 19 C.F.R. 134.1(d)(1) (1996). In light of the relative paucity of precedent on the meaning of these terms under § 1313(b), and the similarity of the analysis under the three statutory schemes, the court will rely in part on interpretations of the subject terms under all three statutory schemes, recognizing that differences in the underlying statutory language and purposes may in some instances preclude reliance on the latter.

necessary . . . . There must be transformation; a new and different article must emerge, having a distinctive name, character, or use." Anheuser-Busch Brewing Assoc. v. United States, 207 U.S. 556, 562 (1908) (citations and punctuation omitted) (holding that certain corks for bottling beer did not qualify for drawback because they had not been "manufactured" within the United States; "A cork put through the claimant's process is still a cork."). This seminal definition has been applied not only in the drawback context but in numerous other areas of tariff law. The term "produced" was a later addition to the drawback statute. Some courts have concluded that the added term must represent an attempt to extend the availability of drawback; otherwise, the new term would be mere surplusage, a result the courts have consistently abhorred. See United States v. Int'l Paint Co., Inc., 35 CCPA 87, 91-92 (1948) (reviewing legislative history); Rolland Freres, Inc. v. United States, 23 CCPA 81, 86 (1935) ("We are inclined to agree . . . that Congress, by the use of the new language in connection with the word 'produced', intended to authorize drawback on certain articles which had not been 'manufactured' as that term was sometimes technically defined."). Nevertheless, the courts have not been "disposed to give the provision such a construction as would warrant the allowance of drawback upon every article which had been brought into this country and subsequently exported, merely because some manufacturing effort had been expended thereon." Rolland Freres, 23 CCPA at 86. Later decisions have incorporated the question of whether an article is "produced" into the original test of "manufacture".

In the wake of Anheuser-Busch, subsequent decisions have shown the difficulty of "tak[ing] concepts applicable to products such as textiles and apply[ing] them to combinations of liquids or fabrication of steel articles." Superior Wire v. United States, 11 CIT 608, 615, 669 F. Supp. 472, 479

(1987), aff'd, 867 F.2d 1409 (Fed. Cir. 1989). "[C]ourts have been reluctant to lay down specific definitions in this area of the law other than to discuss the particular facts of cases under the particular tariff provisions involved." Belcrest Linens v. United States, 741 F.2d 1368, 1372 (Fed. Cir. 1984).

Application of the Anheuser-Busch definition thus has evolved into a highly flexible "name, character or use" test, also known as the "substantial transformation" test, which looks to whether the article in question has been subjected to a process which results in the article having a name, character or use different from that of the imported article. See, e.g., Int'l Paint, 35 CCPA at 93-94; Nat'l Juice Products, 10 CIT at 58, 628 F. Supp. at 988. A "substantial transformation of the original materials may be found where there is a definite and distinct point at which the identifying characteristics of the starting materials is [sic] lost and an identifiable new and different product can be ascertained. A transitional stage of a material in process, advancing toward a finished product, however, may not be sufficient." F.F. Zuniga v. United States, 996 F.2d 1203, 1206 (Fed. Cir. 1993) (citation omitted). In applying the "name, character or use" test, courts have focused primarily on changes in use or character of the item,[13] turning to various subsidiary tests depending on the situation. Superior Wire, 11 CIT at 614-15, 669 F. Supp. at 478 (listing decisions adopting such subsidiary tests); see also Int'l Paint, 35 CCPA at 94 (exported merchandise underwent a change of character when the processes at issue

---

[13]    Although the test is typically framed in the disjunctive, the "name" criterion has repeatedly been held not dispositive. A change in the name of the product is the weakest evidence of a substantial transformation. See Uniroyal, Inc. v. United States, 3 CIT 220, 542 F. Supp. 1026 (1982), aff'd, 702 F.2d 1022 (Fed. Cir. 1983) (fact that imported product was called an "upper" and final product a "shoe" did not affect the court's finding of no substantial transformation); Int'l Paint., 35 CCPA at 93-94 ("Under some circumstances a change in name would be wholly unimportant and equally so is a lack of change in name under circumstances such as [in this drawback case.]").

fitted the goods for a distinctive use for which the imported merchandise had been wholly unfit).[14]

A review of the decisions applying this test to merchandise with similar characteristics to Precision's merchandise highlights these subsidiary criteria. In Superior Wire, the court considered whether hot-rolled steel wire rod was "substantially transformed" when it was subjected to a cold-drawing process which yielded steel wire. In that process, the rod was drawn through one, two, or sometimes three dies. 11 CIT at 609, 669 F. Supp. at 474. The resulting product was substantially stronger, cleaner, smoother, less springy, less ductile, and cross-sectionally more uniform. Id. Evidence reflected that the cost of setting up such a facility was relatively low. 11 CIT at 610-11, 669 F. Supp. at 475. The process added approximately 15% in value to the product. Id. at 611, 669 F. Supp. at 475. The uses for which the product was suitable did not narrow. Id. at 617, 669 F. Supp. at 480. The goods did not change from "producers' goods" to "consumers' goods". Id. Based on these findings, the court determined that there had been no significant change in the use or character of the imported merchandise.

In Ferrostaal Metals Corp. v. United States, 11 CIT 470, 664 F. Supp. 535 (1987), the court considered the country of origin of certain steel sheet which had been annealed and galvanized in New Zealand by a process known as "continuous hot-dip galvanizing" using full hard cold-rolled steel sheet

---

[14]     Superior Wire also identified certain other tests for use in this field. Review of the body of cases in the drawback and related contexts do not find widespread use of those tests, which are thus not detailed here. See, e.g., Ferrostaal Metals Corp. v. United States, 11 CIT 470, 473-74, 664 F. Supp. 535, 538 (1987) (rejecting essence test as not grounded in precedent); CPC Int'l, Inc. v. United States, 21 CIT 784, 794, 971 F.2d 574, 583 (1997) (rev'd on other grounds, 165 F.3d 1371 (1999)) ("the court finds that the essence test is embraced by and aids in applying the traditional changed of name, character or use test").

from Japan. The court considered whether the galvanizing and annealing process resulted in a "substantial transformation" of the merchandise. "Although the process affects the distribution of carbon and nitrogen in the [steel] sheet, annealing does not change the actual chemical composition and dimensions of the sheet." 11 CIT at 475, 664 F. Supp. at 539. The galvanizing process, which was accomplished by dipping the sheet in molten zinc, was "an irreversible process which provides electrochemical protection to the sheet." Id. The court found that the annealing process added a strength and ductility which "significantly affects the character by dedicating the sheet to uses compatible with the strength and ductility of the steel. A change in the end uses of products . . . is itself indicative of a change in the character of the product." Id. at 476, 664 F. Supp. at 540. The court also found that "the hot-dip galvanizing process is substantial in terms of the value it adds to full hard cold-rolled steel sheet. The evidence showed that the Japanese product is sold for approximately $350 per ton, while the hot-dipped galvanized product is sold for an average price of $550 to $630 per ton." Id. at 477, 664 F. Supp. at 540. "Testimony at trial overwhelmingly demonstrated that cold-rolled steel is not interchangeable with steel of the type imported, nor are there any significant uses of cold-rolled sheet in place of annealed sheet." Id. "Such a change in the utility of the product is indicative of a substantial transformation." Id. at 477, 664 F. Supp. at 541. The court also found that a change in the name of the product, and of its tariff classification, further supported its conclusion that the product had undergone a "substantial transformation". Id. at 478, 664 F. Supp. at 541.

Against the yardstick of the "substantial transformation" test, the court turns to the issue of whether "waste" or "valuable waste" is properly included within the ambit of articles which have been manufactured or produced. Plaintiff contends that there is no basis in law for this distinction, as it

appears in 19 C.F.R. §191.22(a)(2), in T.D. 81-74, and in Customs' ruling on Plaintiff's protest.

Plaintiff's Brief at 25 ("While Congress has seen fit to limit drawback in certain respects (see 19 U.S.C.

§ 1313(w)), it has not limited drawback with respect to stainless steel scrap, nor for that purpose scrap

metal generally -- or even waste. It is a well-settled canon of statutory construction that exceptions are

not to be implied, nor can an exception be created by construction."). As detailed below, the court

concludes that Customs' regulation carving out "waste" from drawback eligibility has emerged not as an

"exception" to the drawback statute, but in recognition of the fact that "waste" is not, as a matter of

definition, an article "manufactured or produced", as is necessary to trigger the privileges conferred by

§ 1313(b).

Numerous decisions have discussed this distinction. Two of these have been cited with

particular frequency in this context.

In Patton v. United States, 159 U.S. 500 (1895), the Supreme Court considered whether

certain "wool tops" (wool which had been put through several processes in preparation for spinning)

which had been intentionally broken in order to obtain a lower rate of duty in export, was properly

classified as "woolen waste".[15] The Court noted testimony in the record "tending to show that in

England merchantable tops, broken up for the purpose of exportation, had acquired the commercial

designation of waste, or, more properly, 'broken top waste.'" Id. at 505. The Court considered

whether the imported goods were in fact "waste" for tariff purposes, noting that

---

[15]     Not surprisingly, each decision cited in this opinion in which the importer urged classification of merchandise as "waste" involved a lower duty rate for such a classification than Customs' alternative.

> The prominent characteristic running through all the[] definitions is that of refuse, or material that is **not susceptible of being used for the ordinary purposes of manufacture**. It does not presuppose that the article is absolutely worthless, but that it is unmerchantable, and used for purposes for which merchantable material of the same class is unsuitable.

Id. at 503 (emphasis added). The Court also considered the related issue of whether the imported merchandise constituted "manufactures of wool:"

> Waste, in its ordinary sense, being merely **refuse thrown off in the process** of converting raw wool into a manufacture of wool, **cannot be considered a manufacture simply because it acquires a new designation**, and, if it be artificially produced by the breaking up of tops, it is with even less reason entitled to be so considered. Unless natural waste can be treated as a manufacture, artificial waste should not.

Id. at 508 (emphasis added). The Court thus plainly recognized a distinction between "waste" and "manufactured articles". The Court concluded that the imported merchandise was not waste, because it had not actually been "thrown off in the process of manufacture." Id. at 505. The Court also concluded that the merchandise was not "manufactured":

> [T]he article in question does not fall within the definition of "manufactures" as laid down by this court in numerous cases. Thus, in U.S. v. Potts, 5 Cranch, 284, round copper bottoms turned up at the edge, **not imported for use in the form in which they were imported**, but designed to be worked up into vessels, were held not to be manufactured copper within the intention of the legislature. So, in Hartranft v. Wiegmann, 121 U. S. 609, shells cleaned by acid, and then ground on an emery wheel, and some of them afterwards etched by acid, and intended to be sold for ornaments, as shells, were held to be 'shells,' and not 'manufactures of shell.' The question is fully discussed in Lawrence v. Allen, 7 How. 785, in which, however, it was held that India rubber shoes made in Brazil, by simply allowing the sap of the India rubber trees to harden upon a form, were manufactured articles, because they were **capable of use in that shape** as shoes. Indeed, this was the form in which such shoes were at first made. Finally, in Seeberger v. Castro, 153 U. S. 32, tobacco scrap, consisting of clippings from the ends of cigars and pieces broken from tobacco, of which cigars are made in the process of such manufacture, **not being fit for use in the condition in which they are imported**, were held to be subject to duty as unmanufactured tobacco. This scrap

is in the nature of waste, and the case is directly in point.

Id. at 509 (citations omitted) (emphasis added).  Under this analysis, the determinative question in

ascertaining whether an article has been "manufactured" is whether the merchandise at issue is fit for

some use or application, either as an ingredient or a finished article, without further processing.

The decision in Harley Co. v. United States, 14 Ct. Cust. App. 112, 114-15 (1926), provides

further guidance regarding the distinctions between "waste" and articles that have been manufactured or

produced:

> Waste is something rejected as worthless or not needed; surplus or useless stuff; especially the refuse of a manufacturing process or industrial art, as coal dust or gob; tangled spun thread (usually cotton); the refuse of a textile factory; . . . **broken or spoiled castings for remelting**.

> Since 1883 Congress has recognized the following as wastes:  Wool waste, . . . cork waste, scrap or refuse rubber, worn out by use, **iron and steel fit only for remanufacture** . . . .

> In the tariff sense, waste is a term which includes manufactured articles which have become useless for the original purpose for which they were made and fit only for remanufacture into something else.  It also **includes refuse, surplus, and useless stuff resulting from manufacture or from manufacturing processes and commercially unfit, without remanufacture, for the purposes for which the original material was suitable** and from which material such refuse, surplus, or unsought residuum was derived.  The latter class of waste might be appropriately designated as new waste and includes such things as tangled spun thread, coal dust, broken or spoiled castings **fit only for remanufacture**.[16]

---

[16]      In United States v. Studner, 427 F.2d 819 (CCPA 1970), the court rejected an argument by Customs that, to constitute "waste," goods must be "fit only for remanufacture."  Id. at 820-21.  It rejected as dicta those statements in Harley that imposed such a requirement, and stated that there was no basis for a "fit only for remanufacture" requirement for old waste when it found none for new waste.  427 F.2d at 822.  Upon careful review, it appears that Harley's imposition of a "fit only for remanufacture" requirement was not in fact dicta, and was critical to the ultimate holding in that case.  Ironically, the Studner court's statement regarding new waste was itself dicta, and offers no

Id. (citations omitted) (emphasis added).  See also Barnebey-Cheney Co. v. United States, 487 F.2d

553 (CCPA 1973) (concluding that merchandise consisting of spent activated carbon salvaged from

canisters of gas masks was in fact "waste", as it was "fit only for remanufacture"; the record showed

that the importer subjected the spent carbon to a purification process to remove the absorbed

chemicals, and that the merchandise was not commercially suitable for any application prior to the

removal of those chemicals).[17]   By contrast, an item "which may be repaired without undue expense

and devoted to its original purpose, or which, without remanufacture, has a valuable practical use, is not

waste or old junk."  Harley,14 Ct. Cust. App. at 115.

The decision in E.T. Horn Co. v. United States, 14 CIT 790, 752 F. Supp. 476 (1990), aff'd

and adopted, 945 F.2d 1540 (Fed. Cir. 1991), articulates part of the rationale for the distinction

between waste and manufactured articles.  In that case, the court considered the classification of certain

chemical residues, where the importer claimed that the merchandise at issue should have entered duty

free under TSUS item 793.00, "[W]aste and scrap not specially provided for."  Id. at 790, 752 F.

Supp. at 477.  Customs had classified the merchandise as "[M]ixtures of two or more organic

compounds: . . . Other", under TSUS item 430.20.  Id.  The residues remained after distillation and

---

precedential value, as it was not called on to assess the proper duty for new waste.

[17]       An examination of the treatment of stainless steel scrap in the HTSUS underscores the validity of this definition in the context of stainless steel scrap.  HTSUS Subheading 7204.21.00 covers "Waste and scrap of alloy steel: Of stainless steel" and provides for duty-free entry of such goods.  The applicable Section Notes for HTSUS Section XV, Base Metals and Articles of Base Metals, provide the following definition of "Waste and scrap":  "Metal waste and scrap from the manufacture or mechanical working of metals, and metal goods definitely not usable as such because of breakage, cutting-up, wear or other reasons."  HTSUS Section XV, Note 8(a).  This definition provides a Congressional interpretation of the terms "waste" and "scrap" in this context.

production of the intended products of the manufacturing process, and had a recognized market value.

The court observed that

> Customs has classified waste of a chemical nature under [TSUS 793.00], although a notable feature of those substances has been unsuitability for chemical use or purposes in the conditions imported without further processing.
> **A raw material or product usually has been favored under the import laws, while a material or product improved abroad usually has been subject to a higher rate of duty upon entry**. Also, it has not been general policy for material from used or spent products to be dutiable at the same rate as new material. Thus, to distinguish between chemical products and chemical waste accords with the traditional approach of tariffs.

Id. at 795-96, 752 F. Supp. at 481 (citations omitted) (emphasis added). The court ultimately

concluded, however, that the residues

> possess identifiable chemical properties and . . . are traded for those properties. There is little indication of uselessness of the merchandise in the condition imported. On the contrary, it appears that the [residues], like the [intended products of the manufacturing process], function in their natural conditions as chemical intermediates. In other words, the products at issue are useful and are used as is to make desired end products. . . . That something is a residue of a process does not automatically render the substance waste, entitled to entry duty-free. Changes in technology or demand can and do render what was once waste matter which is sought for its own sake.

Id. at 796-97, 752 F. Supp. at 482 (citations omitted).

Customs has applied these same definitions in numerous decisions. While those decisions have

no precedential value for this court, they help to illustrate the proper application of the "substantial

transformation" or "name, character or use" test.

In C.S.D. 82-96, 16 Cust. B. & Dec. 860 (1982), Customs considered whether drawback

was payable on certain substandard semiconductor devices which resulted from the production of

standard devices. The substandard devices had the same "form, identity and characteristics" as the

standard devices; the only difference was that the former devices were much less reliable and much slower than the latter. 16 Cust. B. & Dec. at 860. Because of this difference, the substandard devices were salable only in a broad secondary market, which exceeded the scrap value of the devices. Id. As a factual matter, however, the importer destroyed the devices in a foreign trade zone, to avoid warranty claims. Id. Customs allowed drawback, concluding that the standard and substandard devices were merely different brands of the same finished product. Id.

In C.S.D. 82-109, Customs considered whether tobacco scrap, tobacco stems, and tobacco dust and dirt, all of which were "fit only for remanufacture," were on the one hand "waste" or "valuable waste", or were properly included within the definition of "articles". 16 Cust. B. & Dec. 882 (1982). Under the TSUS provisions at issue, articles produced from merchandise temporarily imported under bond were required to be exported or destroyed, while valuable wastes were permitted to be entered into the country upon payment of the proper duty. See 16 Cust. B. & Dec. at 883. The importer sought to enter the tobacco scrap as valuable waste. Id.

Customs differentiated between "by-products" and "wastes". Customs reviewed the use of the terms in the tariff statutes, noting that

> it is clear that Congress intended different meanings for by-products and waste. For example, the first proviso to section 311, Tariff Act of 1930, as amended (19 U.S.C. 1311), which concerns processing in bonded manufacturing warehouses, allows by-products and waste from cleaning rice to be withdrawn for domestic consumption on payment of duty. The second proviso to that section allows all waste to be destroyed under Customs supervision. Section 313, Tariff Act of 1930, as amended (19 U.S.C. 1313) requires distribution of drawback if more than one article was produced as a result of the use of imported merchandise in a manufacturing process. The courts have construed this latter provision to require distribution of drawback to by-products, which clearly indicates that the term "article" includes by-products.

Id. at 884. Customs then reviewed a number of judicial decisions, pulling from them a variety of characteristics which distinguished waste from byproducts. Waste has "neither the qualities of the starting raw materials or the qualities of an article that is sought or purposely produced." Id. at 884 (citing Willits v. United States, 11 Ct. Cust. App. 499 (1923)). Waste is "not the product of any manufacturing effort designed to produce it as a primary product or as an equally valuable by-product," but is a "thrown-off incident of . . . production." Id. at 884-85 (citing Ishimitsu Co. v. United States, 12 Ct. Cust. App. 477 (1925)). If an item is "required to have labor expended on it in order to make it fit for consumption, [the item is] not classifiable as a manufactured article." Id. at 885 (citing Spaulding v. Castro, 153 U.S. 38 (1894)). Byproducts, on the other hand, were characterized as "new articles that were chemically different from the original raw materials and which had specific uses in their own rights," that were "specifically sought for [their] own value." Id. Based on these criteria, Customs held that the tobacco scrap was waste rather than a by-product. Id. The court finds that these distinctions help to demarcate the boundary between "waste" and "articles manufactured or produced."

Shortly thereafter, Customs issued C.S.D. 83-5, 17 Cust. B. & Dec. 728 (1982), in which it enumerated six criteria for determining whether a given item was properly characterized as waste or as a by-product. Noting that "drawback is allowable on exports of by-products but not on exports of valuable waste," Customs examined:

1.      The nature of the material of which the residue is composed.

2.      The value of the residue as compared to the value of the principal product and the raw material.

3.      The use to which it is put.

4.      Its status under the tariff law, if imported.

5.      Whether it is a commodity recognized in commerce.

6.      Whether it must be subjected to some process to make it saleable.

17 Cust. B. & Dec. at 729.  These criteria incorporate many of the considerations that the courts have employed in making determinations in this area.  See decisions reviewed supra.  Under these guidelines, Customs determined that the merchandise at issue, rejected tubing, was a by-product, because the merchandise at issue differed from the principal product only in that it did not meet A.P.I. specifications.  Id. at 729.  While not useful as premium oil well tubing, the merchandise appeared to have a number of other uses, without any further processing, that were incompatible with classification as waste.  Id.

Customs applied these criteria in subsequent rulings, providing further elaboration on their meaning.  In C.S.D. 84-40, 18 Cust. B. & Dec. 934 (1983), Customs considered whether certain steel tubing and casing, which had been entered temporarily free of duty under bond for fabrication and exportation and was subsequently rejected for various abnormalities, was "valuable waste".  Id. at 935.  The record showed that repair was not an economically feasible option, and that the rejected tubing was best remelted, reextruded, and used in the creation of new tubing.  Id. at 936.  Applying the first criterion, Customs noted that the tubing was no longer suitable for its original purpose, although it was still pipe or tube.  Id. at 937.  Under the second criterion, the value of the goods was nominal – the rejected article had a scrap value of approximately $15, while the un-flawed article was valued at approximately $450.  Id.  The merchandise at issue was used only as scrap.  Id.  No further processing was needed to make the merchandise salable as scrap.  Id.  Customs concluded that the rejected tubing and casing, "when sold as waste or scrap at scrap prices, is valuable waste."  Id. at 939.

Customs distinguished C.S.D. 82- 96, supra, in which it had approved drawback on substandard semiconductor devices, by noting that the semiconductor devices had the same identity, characteristics and TSUS classification as the standard devices, while the rejected tubing did not share those elements with the standard counterparts. Id.

The definitions set forth above, as expounded upon by numerous decisions, can be summarized to yield the following standards. To prevail on a claim that its merchandise is an article manufactured or produced within the meaning of § 1313(b), a plaintiff must satisfy the "substantial transformation" or "name, character or use" test. The court will look to whether a "new and different article" has emerged -- whether the exported merchandise is fitted for a distinctive use for which the imported merchandise was not, or whether it is suitable for a more specialized range of uses than the imported merchandise, or whether it is interchangeable, commercially or otherwise, with the imported merchandise. A transitional product may not be sufficient under this criteria. The court will weigh the cost incurred in subjecting the merchandise to the processes at issue, and will also look for proof regarding the amount and percentage of value added by these processes. The court will consider changes to the character of the merchandise – whether there are changes in the chemical composition of the material or in its physical properties, and whether those changes are irreversible. Finally, the court will consider whether there is a change in the name of the merchandise, and whether there is a change in its tariff classification. No one among these criteria is controlling.

On the other hand, the court will also look for proof as to whether the merchandise at issue falls within the definition of "waste". To this end, the court will consider whether the merchandise is suitable for the ordinary use of the primary product or as a by-product, or whether it is thrown off in the

process of manufacture. Is the merchandise purposely produced? Is the merchandise exported for use

in that form, or must it be remanufactured? "Remanufacture" will mean processing of the good to

render it usable as, in essence, a raw material. If, on the other hand, the article may be repaired or

further processed at minimal expense into a good which has a practical use, such repairs do not

constitute remanufacture.

### 3.

### Plaintiff Has Not Met Its Burden
### Under 19 U.S.C. § 1313(b) and Related Law

Subjecting Plaintiff's motion to these standards, the court concludes that Plaintiff has not met its

burden on summary judgment. The court has in vain reviewed Plaintiff's submissions for evidence

which might prove sufficient to resolve this case. The documentary evidence and depositions are

insufficient to demonstrate that the stainless steel scrap is an "article manufactured or produced." There

is some evidence regarding the processes to which the imported merchandise is subjected.[18] The

record is devoid, however, of evidence as to whether these processes added value to the exported

merchandise -- does scrap sell for more or less than "virgin material"?[19] Is scrap resulting from these

---

[18]     "Precision imported 'hot bands, a product whose tolerances are not as close as cold-finished steel.' Following importation, Precision would z-mill cold-roll, continuous-strand anneal, temper mill, slit, sheet, polish, edge, roller level, shear and stretcher level the imported steel." App. B at 2. "The metallurgical properties (e.g. chemistry, tensile strength) of the residual material are the same regardless of whether the product is ultimately sold as stainless steel sheet, coils, trim, or scrap." App. A-21 at 3. "Cold-rolling . . . hardens the steel as it rolls through the Z-mill. For some products . . . we anneal (or 'soften') it through a heat process." App. O (Declaration of Alan Shaible, dated March 30, 2000) at 2.

[19]     Certain items in the record address this point, but are inconclusive. "[I]f they elected to make the stainless steel product from virgin material, they could do so but it's much more expensive . . . ." App. K (Deposition of Stephen A. Weiner, taken February 29, 2000) at 58. "Stainless steel scrap

processes more valuable or sought-after than scrap that results from other processes? Is such scrap fitted for more specific uses than the virgin material?[20] Are the qualities imparted by these processes lost in the remelting process?

Plaintiff attempts to distinguish stainless steel scrap and trim from other substances created during the manufacturing process, such as "filter cake" and "swarf", for which no market exists and for which plaintiff incurs disposal costs. Plaintiff's Brief at 16-17. Plaintiff argues that stainless steel scrap is not waste because it is valuable, citing to expert affidavits of persons knowledgeable in the industry. Id. at 14, 17. Plaintiff contends that only such nonmarketable, apparently valueless items as "filter cake" and "swarf" are "waste" within the meaning of the 19 C.F.R. § 191.22(a)(2). Plaintiff implicitly contends that the term "waste" applies only to items for which no market exists – essentially, valueless items.

This distinction is not tenable, in light of the legal definition, detailed supra, of the terms "waste" and "article manufactured or produced," which Plaintiff has ignored. First, the drawback prohibition of 19 C.F.R. 191.22(a)(2) applies not only to mere "waste", but also to "valuable waste". Second, under

_____

is a valuable commodity that reduces our costs . . . ." App. O at 5. "The scrap ratio [in the product into which the scrap is made] is also influenced by the relative cost of scrap and hot metal." App. M (The Making, Shaping and Treating of Steel (11th ed. 1998)) at 491.

[20]   Evidence on this point is also inconclusive. "[I]f you have a bale of 300 series stainless steel – which is basically the export terminology sabot, s-a-b-o-t – you couldn't use that to make a 400 series stainless steel because of the nickel units, okay? So if you have a bale of sabot, you can only use it to make a 300 series stainless  steel." App. K at 59. "Stable elements present in scrap, such as copper, molybdenum, tin and nickel cannot be oxidized and hence cannot be removed from metal. These elements can only be diluted. Detinned bundles, where tin is removed by shredding and treating with NaOH and then rebaled, are available but at considerably higher cost." App. M at 491.

the governing law in this field, there is no basis for a distinction between "waste" and "valuable waste". The value of an article is only one consideration, and that factor requires a quantitative comparison between the imported article and the exported article, not between the exported article and another article yielded by the process. Plaintiff has failed to provide such an analysis.

Plaintiff argues that "Customs has insufficient grounds to support its conclusion that the merchandise at issue is waste." Plaintiff's Brief at 17. Plaintiff's arguments on this point subject Customs' ruling to the yardstick of Plaintiff's factual argument, and ignore the legal standards that govern this area of the law. Plaintiff's contention is without merit. Moreover, it is Plaintiff, rather than Customs, that bears the burden of proof here.

Plaintiff's arguments based on the classifications of scrap metal under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 (1999) et seq., and the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 (1984) et seq., are equally misplaced. Plaintiff has elected to ignore the extensive body of law in the drawback context, and has relied on authority in wholly unrelated areas of the law. Customs' regulations and those cited by Plaintiff are promulgated under completely different statutes and hence one cannot be considered binding on the other. Moreover, the policies underlying the regulations are quite different and the interests of one would not be furthered by relying on the other. See Nat'l Juice Products, 10 CIT at 60 n.15, 628 F. Supp. at 989 n.15. "The theory underlying the granting of drawback . . . is and always has been that it would encourage the development in the United States of the making of articles for export, thus increasing our foreign commerce and aiding domestic industry and labor." Int'l Paint, 35 CCPA at 90. The purpose of the CERCLA amendments cited by Plaintiff is threefold:

to promote the reuse and recycling of scrap material in furtherance of the goals of waste minimization and natural resource conservation while protecting human health and the environment; 2) to create greater equity in the statutory treatment of recycled versus virgin materials; and (3) to remove the disincentives and impediments to recycling created as an unintended consequence of the 1980 Superfund liability provisions."

Consolidated Appropriations Act, 2000, Pub. L. No. 106-113, § 6001, 113 Stat. 1501, 1501A-598-99 (2000). The objectives of RCRA are to promote the protection of health and the environment and to conserve valuable material and energy resources by promoting improved solid waste management, resource recovery, and resource conservation systems, regulating the treatment, storage, transportation, and disposal of hazardous wastes which have adverse effects on health and the environment. RCRA, Pub. L. No. 94-580, § 1003, 90 Stat. 2795 (1976). The purposes of the latter acts bear no resemblance to that of the drawback statute. In light of this divergence, and in light of the significant existing authority under the drawback statute, the court declines to accept Plaintiff's CERCLA- and RCRA-based arguments.

For these reasons, the court finds that Plaintiff has failed to satisfy its burden of proof to show that the characteristics of the merchandise at issue bring it within the range of goods eligible for drawback.

## C.

### Customs' Denial of Plaintiff's Protest Did Not Violate 19 U.S.C. § 1625(c)

Plaintiff argues that, even if the court concludes that Customs' denial of Plaintiff's protest was otherwise proper, it is entitled to summary judgment. As grounds for this assertion, Plaintiff argues that Customs' determination that Precision's stainless steel scrap is not eligible for drawback can only be

applied prospectively, under 19 U.S.C. § 1625 (1994)[21].

---

[21]     This statute provides as follows:

§ 1625.  Interpretive rulings and decisions; public information

(a) Publication

 Within 90 days after the date of issuance of any interpretive ruling (including any ruling letter, or internal advice memorandum) or protest review decision under this chapter with respect to any customs transaction, the Secretary shall have such ruling or decision published in the Customs Bulletin or shall otherwise make such ruling or decision available for public inspection.

(b) Appeals

 A person may appeal an adverse interpretive ruling and any interpretation of any regulation prescribed to implement such ruling to a higher level of authority within the Customs Service for de novo review.  Upon a reasonable showing of business necessity, any such appeal shall be considered and decided no later than 60 days following the date on which the appeal is filed. The Secretary shall issue regulations to implement this subsection.

**(c) Modification and revocation**

 **A proposed interpretive ruling or decision which would-**
        (1) modify (other than to correct a clerical error) or revoke a prior interpretive ruling or decision which has been in effect for at least 60 days; or
        **(2) have the effect of modifying the treatment previously accorded by the Customs Service to substantially identical transactions;**

**shall be published in the Customs Bulletin.  The Secretary shall give interested parties an opportunity to submit, during not less than the 30-day period after the date of such publication, comments on the correctness of the proposed ruling or decision.  After consideration of any comments received, the Secretary shall publish a final ruling or decision in the Customs Bulletin within 30 days after the closing of the comment period.  The final ruling or decision shall become effective 60 days after the date of its publication.**

(d) Publication of customs decisions that limit court decisions

Precision relies on § 1625(c)(2). Plaintiff's Brief at 28. These provisions of § 1625(c) were added in 1993; they did not have a counterpart in earlier versions of § 1625. See 19 U.S.C. § 1625(c) (1988). The pertinent language was added as part of amendments made by the Customs Modernization Act (commonly referenced as the "Mod Act"), Pub. L. No. 103-182, 107 Stat. 2057 (1993).

There have been few decisions to date implicating § 1625(c), and none has set forth a framework for application of its provisions. Unfortunately, the legislative history of § 1625(c) offers no guidance. The lack of any specific legislative history, however, does not eliminate this court's duty to employ the plain meaning of the language that the Congress adopted. United States v. Bornstein, 423 U.S. 303, 310 (1976). The Supreme Court has stated that "deference to the supremacy of the Legislature, as well as recognition that Congressmen typically vote on the language of a bill, generally requires [courts] to assume that 'the legislative purpose is expressed by the ordinary meaning of the

---

A decision that proposes to limit the application of a court decision shall be published in the Customs Bulletin together with notice of opportunity for public comment thereon prior to a final decision.

(e) Public information

The Secretary may make available in writing or through electronic media, in an efficient, comprehensive and timely manner, all information, including directives, memoranda, electronic messages and telexes which contain instructions, requirements, methods or advice necessary for importers and exporters to comply with the Customs laws and regulations. All information which may be made available pursuant to this subsection shall be subject to any exemption from disclosure provided by section 552 of title 5.

(Emphasis supplied indicates portions on which Plaintiff relies.)

words used.'" United States v. Locke, 471 U.S. 84, 95 (1985) (quoting Richards v. United States,

369 U.S. 1, 9 (1962)).

From the plain wording of the statute, § 1625(c)(2) is violated when: (1) an interpretive ruling

or decision (2) effectively modifies (3) a "treatment" previously accorded by Customs to (4)

"substantially identical transactions", and (5) that interpretive ruling or decision has not been subjected

to the notice-and-comment process outlined in § 1625((c)(2). Plaintiff must show then that Customs'

October 10, 1997 denial of Precision's protest was a ruling, and that it changed a "treatment"

previously accorded by Customs to substantially identical transactions, and that Customs failed to

follow the notice-and-comment procedure outlined in § 1625(c)(2).

Prior to the passage of the Mod Act, the substance of these requirements already appeared, in

more detailed and more discretionary form, in 19 C.F.R. § 177.10 (1993)[22].

---

[22]       Section 177.10 provided, at the time, in pertinent part:

177.10 Publication of decisions.

 (a) *Generally*. Within 120 days after issuing any precedential decision under the Tariff
Act of 1930, as amended, relating to any Customs transaction (prospective, current, or
completed), the Customs Service shall publish the decision in the Customs Bulletin or
otherwise make it available for public inspection. For purposes of this paragraph a
precedential decision includes any ruling letter, internal advice memorandum, or protest
review decision. Disclosure is governed by 31 CFR Part 1, 19 CFR Part 103, and 19
CFR 177.8(a)(3).

 (b) *Rulings regarding a rate of duty or charge*. Any ruling regarding a rate of duty
or charge which is published in the Customs Bulletin will establish a uniform practice. A
published ruling may result in a change of practice, it may limit the application of a court
decision, it may otherwise modify an earlier ruling with respect to the classification or
valuation of an article or any other action found to be in error or no longer in
accordance with the current views of the Customs Service, or it may revoke a

See American Bayridge Corp. v. United States, 35 F. Supp. 2d 922, 939 (1998) (partially vacated on

other grounds, 217 F.3d 857 (Fed. Cir. 1999)) ("The Court thinks it no small coincidence that nearly

previously-published ruling or a previously-issued ruling letter.

 (c) *Changes of practice or position*. (1) Before the publication of a ruling which has the effect of changing a practice and which results in the assessment of a higher rate of duty, notice that the practice (or prior ruling on which the practice is based) is under review will be published in the FEDERAL REGISTER and interested parties given an opportunity to make written submissions with respect to the correctness of the contemplated change. This procedure will also be followed when the contemplated change of practice will result in the assessment of a lower rate of duty and the Headquarters Office determines that the matter is of sufficient importance to involve the interests of domestic industry. No advance notice will be provided with respect to rulings which result in a change of practice but no change in the rate of duty.

 (2) Before the publication of a ruling which has the effect of changing a position of the Customs Service and which results in a restriction or prohibition, notice that the position (or prior ruling on which the position is based) is under review will be published in the FEDERAL REGISTER and interested parties given an opportunity to make written submissions with respect to the correctness of the contemplated change. This procedure will also be followed when the change of position will result in a holding that an activity is not restricted or prohibited and the Headquarters Office determines that the matter is of sufficient importance to involve the interests of the general public.

 (d) *Limiting rulings*. A published ruling may limit the application of a court decision to the specific article under litigation, or to an article of a specific class or kind of such merchandise, or to the particular circumstances or entries which were the subject of the litigation.

 (e) *Effective dates*. Except as otherwise provided for in the ruling itself, all rulings published under the provisions of this part shall be applied immediately. If the ruling involves merchandise, it will be applicable to all unliquidated entries, except that a change of practice resulting in the assessment of a higher rate of duty or increased duties shall be effective only as to merchandise entered for consumption or withdrawn from warehouse for consumption on or after the 90th day after publication of the change in the FEDERAL REGISTER.

19 C.F.R. § 177.10 (1993).

identical language has moved from the Code of Federal Regulations to the United States Code,

appearing as 19 U.S.C. § 1625(c), but absent discretionary language."). When Congress enacts a law

it is presumed to know the existing law pertinent to legislation it enacts. See Bristol-Myers Squibb Co.

v. Royce Laboratories, Inc., 69 F.3d 1130, 1136 (Fed. Cir.1995); Koyo Seiko Co., Ltd. v. United

States, 36 F.3d 1565, 1572 (Fed. Cir.1994); VE Holding Corp. v. Johnson Gas Appliance Co., 917

F.2d 1574, 1581 (Fed. Cir.1990); United States v. Douglas Aircraft Co., 510 F.2d 1387, 1391-92

(1975) (stating Congress is presumed to know of the existence of regulations).

The wording of § 1625, on the whole, bears a striking resemblance, paragraph by paragraph,

to that already embodied in § 177.10: § 1625(a) parallels § 177.10(a); § 1625(c) closely tracks the

concepts and structure of § 177.10(c); § 1625(d), like § 177.10(d), deals with rulings that limit court

decisions. Subsection 1625(c), however, is broader in scope than its predecessor: for example, it

requires publication of any "ruling" (or "decision" – an additional word which appears to further

broaden the reach of § 1625(c)) which would modify or revoke a prior ruling or decision, where its

predecessor only required publication of certain rulings which would result in assessment of a different

rate of duty. Subsection 1625(c) also requires publication when a ruling would modify a prior

"treatment" – a term that is not found in 19 C.F.R. § 177.10. This term does, however, appear in the

related provisions of 19 C.F.R. § 177.9(e) (1993).[23] See American Bayridge, 35 F. Supp. 2d at 939-

---

[23]     Section 177.9(e) provided, at the time § 1625 was enacted, as follows:

(e) *Ruling letters modifying past Customs treatment of transactions not covered
by ruling letters*–(1) *General*. The Customs Service will from time to time **issue a
ruling letter covering a transaction or issue not previously the subject of a
ruling letter and which has the effect of modifying the treatment previously**

40.[24]

The court has found no regulation or decision defining the term "treatment" for purposes of §

1625(c) or its predecessor regulations.  Nor does the legislative history offer any guidance on this point.

When a word is undefined in a statute, the agency and the reviewing court normally give the undefined

term its ordinary meaning.  See Perrin, 444 U.S. at 42.  "To assist it in ascertaining the common

meaning of a tariff term, the court may rely upon its own understanding of the terms used, and it may

consult lexicographic and scientific authorities, dictionaries, and other reliable information sources."

---

> **accorded by the Customs Service to substantially identical transactions** of either
> the recipient of the ruling letter or other parties.  Although such a ruling letter will
> generally be effective on the date it is issued, the Customs Service may, upon
> application by an affected party, delay the effective date of the ruling letter, and
> continue the treatment previously accorded the substantially identical transaction, for a
> period of up to 90 days from the date the ruling letter is issued.  (2) *Applications by
> affected parties.*  In applying to the Customs Service for a delay in the effective date of
> a ruling letter described in paragraph (e)(1) of this section, an **affected party must
> demonstrate to the satisfaction of the Customs Service that the treatment
> previously accorded by Customs to the substantially identical transactions was
> sufficiently consistent and continuous that such party reasonably relied thereon
> in arranging for future transactions**.  The evidence of past treatment by the
> Customs Service shall cover the 2-year period immediately prior to the date of the
> ruling letter, listing all substantially identical transactions . . . .  The evidence of reliance
> shall include contracts, purchase orders, or other materials tending to establish that the
> future transactions were arranged based on the treatment previously accorded by the
> Customs Service.

19 C.F.R. § 177.9(e) (1993) (emphasis added).

[24]    "Modification and revocation of ruling letters were discussed in the old regulations but
were not present in 19 U.S.C. § 1625 prior to its amendment by the Mod Act. . . .  [T]he issuance of a
ruling letter that would have the effect of modifying treatment previously accorded by Customs to
substantially identical transactions appeared in 19 C.F.R. § 177.9(e). . . .  The amended language of
the statute removes the discretion to publish found in the regulation . . . ."  American Bayridge, 35 F.
Supp. 2d at 939-40.

Brookside Veneers, 847 F.2d at 789.

     Webster's Dictionary provides the following relevant definitions of the term "treatment":

> **1 :** the action or manner of treating: as **a :** conduct or behavior towards another party (as a person, thing, or group) <regulations . . . for the ~ of all interned civilians –J.S.Pictet> . . . **d :** the action or manner of dealing with something often in a specified way  <get capital gains ~ on income from a patent sale –J.T. Norman> <views . . . on the proper ~ of the conquered southern states –Carol L. Thompson> <a passage remarkable for its ~ of the age-old problem of freedom and authority  –R.M.Weaver> . . . **6 :** the techniques or actions customarily applied in a specified situation: as **a :** a pattern of actions (as insults, annoyances, or physical  punishment) designed to punish or persuade <the new recruit got the ~ from a brutal sergeant> **b :** a pattern of actions (as the bestowal of gifts or favors) designed to reward, encourage, or convince <getting the standard ~ of cocktail parties, press interviews and deals with advertisers –*Time*>

Webster's Dictionary at 2435.  Recurrent in this definition are words such as "often", "customarily" and "pattern" -- all terms which necessitate multiple occurrences.   This echoes the requirement in 19 C.F.R. § 177.9(e)(2) that the importer show "consistent and continuous" treatment of "substantially identical transactions."  On the other hand, § 177.9(e)(1) does at one point use the term "treatment" with regard to a single transaction: "the treatment previously accorded the substantially identical transaction."  It would thus appear that under § 177.9(e), the handling of a single transaction could conceivably give rise to a "treatment".  Section 1625(c)(2), however, speaks of a "treatment" accorded to "substantially identical transactions" – transactions here is plural.  It would thus appear that the requirements of § 1625(c)(2) are not implicated by a single antecedent transaction.  How many "transactions" then are needed to give rise to a "treatment" sufficient to trigger the protections of § 1625(c)?

     The court finds some guidance on this point by noting that the use of the word "treatment", rather than "position", represents a Congressional departure from the language of the apparent source

text of § 177.10. The court can only assume that this change was made in an effort to move away from the strict judicially-created definition of the term "position". At the time § 1625(c) was enacted, the courts required a showing of substantial proof as a prerequisite for any finding of a "position" under § 177.10. See Superior Wire v. United States, 867 F.2d 1409, 1413 (Fed. Cir. 1989) (rejecting argument that a letter ruling, available to the public on microfiche but not published in the Customs Bulletin, constituted a "position" changeable only after notice in the Federal Register and public comment); Arbor Foods, Inc. v. United States, 9 CIT 119, 123, 607 F. Supp. 1474, 1478 (1985) ("Customs' establishment of a 'position' would be along the same lines as that of an 'established and uniform practice' under 19 U.S.C. § 1315(d) (1982). In that respect, such a 'position' or 'practice' would require uniform liquidations among the many ports over a period of time."); Nat'l Juice Products Assoc., 10 CIT at 62-64, 628 F. Supp. at 992-93 (finding that a "position" did exist because Customs published several rulings in the Customs Bulletin that supplied a factually explicit description of a position in effect for at least six years). See also Jewelpak Corp. v. United States, 20 CIT 1402, 1406-07, 950 F. Supp. 343, 348 (1996) (finding no "position" where Customs presented unrefuted proof that Customs did not previously have an established practice or position regarding the subject merchandise, and plaintiff admitted that classification of such containers may have varied). The assessment of whether a "position" existed looked to indicia of a formal or informal policy applied by Customs.        It appears that a "treatment" may be found where a "position" might not – that the definition of "treatment" does not require publication or liquidation among many ports over many years. The term "treatment" looks to the actions of Customs, rather than its "position" or policy. It is also

distinct from the terms "ruling" and "decision," which are governed by § 1625(c)(2).[25] This construction would recognize that importers may order their actions based not only on Customs' formal policy, "position," "ruling" or "decision," but on its prior actions. This construction furthers the stated legislative intent underlying § 1625(c).

It is under these criteria that the court must analyze Plaintiff's claim for relief under § 1625(c). Plaintiff has not presented the court with sufficient record evidence to conclude that all five elements of § 1625 are satisfied. The payment of drawback on 69 previous entries of stainless steel scrap was a "treatment" under § 1625(c), because those prior entries (assuming more than one of these can be shown to be "substantially identical" to the merchandise at issue) constituted more than a single transaction. While Plaintiff has not pointed to record evidence which would have risen to the level of a "position", the court is forced to conclude that the "treatment" requirement of § 1625(c) is not so stringent. However, Plaintiff has failed to provide the court with evidence documenting its claim that Customs approved drawback on substantially identical transactions. Not only has Plaintiff failed to provide information regarding the dates, ports, and exact nature of each of the earlier transactions, but it has not even provided a clear description of the merchandise on which drawback was denied. Nor has Plaintiff presented the Court with any evidence to indicate whether or not Customs followed the notice-and-comment procedure prior to the issuing the October 10 decision. The absence of record evidence

---

[25] The fact that § 1625(c)(2) provides for relief even when the proposed ruling or decision would not modify any prior ruling forecloses any argument that there is no modification sufficient to trigger § 1625 because Customs' position was already contained in, and did not vary from, prior rulings such as C.S.D. 80-137. The bases for relief set forth in § 1625(c)(1) and (2) exist independent of each other.

on these points bars summary judgment in Plaintiff's favor.

## V.

## CONCLUSION

For the foregoing reasons, Defendant's Motion for Reconsideration and/or Relief From the

Court's Order Dated May 24, 2000 is granted in part and denied in part.

Because Plaintiff has failed to meet its burden on summary judgment, and because the court

finds outstanding issues of material fact, the Plaintiff's Motion for Summary Judgment is denied.

_____
Evan J. Wallach, Judge

Dated:  September 20, 2000
        New York, New York